SPARKILL REALTY CORPORATION and Another, Respondents, *v.* THE STATE OF NEW YORK, Appellant. (Claim No. 19587.)

Judgment affirmed, with costs. Hill, P. J., Rhodes, Crapser and Heffernan, JJ., concur; McNamee, J., dissents, with an opinion.

The Sparkill Realty Corporation and the Standard Trap Rock Corporation are domestic corporations, and respectively are owner and lessee of the lands in question, located in Rockland county and appropriated by the State. These two corporations filed a joint claim for damages, and a joint award was made in their behalf. Pursuant to article 16, part 9, of the Conservation Law, the commissioners of the Palisades Interstate Park, on October 11, 1928, appropriated the lands mentioned for park purposes. The property consisted of 168 acres, of which 110 acres were rock land, so called, containing a deposit of trap rock, and the other 58 acres consisted of salt meadow, so called, that is, swale, or low, wet, marsh lands, or lands flooded with the tides of the Hudson river. About one acre of this low land was river front, and the balance was adjacent thereto and near the river. The rock land was estimated to contain about 15,000,000 cubic yards of trap rock, an amount from which could be blasted and manufactured about 27,000,000 cubic yards of crush stone. Claimants had begun the development of a stone quarry and a stone crushing plant on the premises, and had expended a large sum of money in doing so, and a further outlay of about $500,000 was necessary to complete the work. This prospective quarry was located about twenty-five miles from New York, and within a few hundred feet from dwellings, a church, and a factory in the village of Piermont. The chief market in this section for coarse aggregates, such as crush stone and gravel, was located in New York city, where, it was estimated, at least 10,000,000 cubic yards of these materials were sold annually; and of this amount about 4,000,000 cubic yards were crush stone of various kinds, including trap rock. At the time of trial crushed stone was being produced in quarries on the river at one dollar and ten cents, and was

being sold in the New York market at one dollar and ninety cents per cubic yard. No dock facilities formed any part of these lands, nor was there deep water adjacent thereto; and the lands under water in front of the premises in question were owned by the State. The stone on these premises was of a kind and quality to be commercially acceptable for use as a coarse aggregate in the building trades; but there was no dearth of these building materials, as other quarries making crush stone from trap rock, and other coarse aggregates that were acceptable and more extensively used, were running only part time. The claimant corporations had never conducted the business of operating a stone quarry or a crushed stone plant, nor any business; and the land in question was never used for any business purpose. The Sparkill Corporation was incorporated for $30,000, and its capital stock was never increased. In 1914 it bought the land in question, and it has placed no incumbrances thereon. At the time of purchase the land was unimproved and idle, and has remained so since that time, except for the steps taken to develop the quarry mentioned. For the three years before appropriation the land was assessed for $15,000, and the owner appraised it for sale in the years of 1923, 1924 and 1925 for the successive amounts of $50,000, $100,000 and $150,000; and the increase in stone land in Rockland county between 1923 and 1929 did not exceed ten per cent. Stone land is commonly sold by the acre. The claimants did a substantial amount of dredging in the Hudson river in front of the land in question, with a view to constructing a dock and reaching deep water in the channel, at an expense of over $16,000; but the land thus dredged belonged to the State, and before the project was finished the work was stopped on the direction of the public authority. In addition to the land mentioned, the State appropriated certain structures thereon intended by the claimants for use in conducting a quarry and in crushing stone. The theory on the trial was that the structures were suitable for the best use of the land, and that the value of the land was enhanced *pro tanto* by the cost of the structures; that the claimants were entitled to be reimbursed for the expenditures thus made, and that there is relatively small difference of opinion between counsel as to what those structures were, or what was their value. The parties are in accord that the sum of $584,260.65 was expended by claimants, for one purpose or another, before the attempted development of the quarry was interrupted by the appropriation. From this gross sum it was found by the trial court, by findings for the State 11, 12, 13, 17, 19 and 20, that three items paid for royalties and for electric current, and for equipment and portable machinery not affixed to the realty, aggregating $109,578.66, were not taken by the State, and this reduced the total of expenditure for improvements to $474,681.99. Two other items, which entered into the gross expenditures above mentioned, are in dispute. One of these was found by the finding for the State 15 to amount to $16,437.64, for the dredging done by the claimants on the State's land under the water of the Hudson river. This amount was allowed by the trial court against the State as a proper expenditure in the improvement of the land. The second of these items was found in finding for the State 16, to amount to $12,534.73 for general organization and office expense, commissions paid on the sale of stock and similar items. This amount was allowed against the State by the trial court by State's finding 21. If these two items aggregating $28,972.37 be deducted from the cost of structures on the land it will leave a total expenditure of the sum of $445,709.62 as the net cost of

structures affixed to the land and appropriated by the State. The Court of Claims made an award to the claimants of $1,650,000 for the real property taken, and interest thereon amounting to $444,950, together with an allowance of $5,000 as reimbursement for expenses in procuring a title search and abstract, in all $2,099,950. Other facts will be referred to in the opinion.

McNAMEE, J. (dissenting). A substantial part of the record of six volumes in this case, and of the scholarly and extensive briefs of counsel, is occupied with discussions of the question of good faith of the parties, as the same is thought to be evidenced by the official conduct of the park commissioners in the performance of their public duties, and by the conduct of claimants in dealing with their own land, before appropriation. As a result of these considerations, the claim itself was greatly extended, irrelevant and extensive correspondence and records of proceedings in Federal courts were admitted in evidence. And so, argument of counsel touching the good faith of the parties was heard at length, and these matters finally found their way into the findings, the decision, and the opinion of the court below. The question of good faith was not involved in the issues tried here, nor relevant to any fact in issue. The good faith of either party can neither lessen nor enlarge the rights of the other, nor authorize the Court of Claims to find anything greater or less than the market value of the premises in question at the time of taking. This subject-matter was immaterial, and should have been excluded. It appears in the evidence (Claimants' Exhibit 18) that on May 18, 1928, the claimants expended $1,350 for a title search, and this was allowed against the State as a " development " expense. The taking occurred on October 11, 1928, five months later. It appears from the same exhibit that expenditures made up to September 30, 1930, did not include any other investigation of the title. But the trial court took testimony that the claimants had paid $5,000 to a different title company for another title search and abstract of title procured " on advice of counsel," and awarded this sum against the State. There was no proof of the necessity of such an abstract, nor of the reasonableness of the expense, if it were necessary. The testimony was that it " cost " the claimants that sum. The powers and duties of the park commission, the method of acquiring title, the payment of awards and costs are found in the Conservation Law (Laws of 1928, chap. 242), and in particular in section 761 and section 59, subdivisions 7 and 18, of that law. The statute does not require the furnishing of an abstract, and imposes no such duty upon the claimants; neither is there authority in the statute authorizing the Court of Claims to make such an allowance. On the contrary, section 34 of the Court of Claims Act provides that the court, " whenever the appraised value of the premises appropriated shall be less than two hundred dollars, shall in their award make a reasonable allowance for the expense of procuring the abstract of title and certificate of search as to encumbrances, which the statutes require shall be furnished the comptroller before the payment of any damages." No other statutory authority was referred to in the briefs, and of course this statute is no warrant for the allowance made. Claimants contend that the cases of *Burchard* v. *State* (128 App. Div. 750) and *Taggarts Paper Co.* v. *State* (187 id. 843, 849) are authorities for the action of the court below. An examination of those cases indicates that they have no application here. In the *Burchard* case such an allowance was permitted because the statute required the claimant to furnish an abstract of title before he could be

paid for his land. The *Taggarts* case did not pass on this question, because there was no proof on the subject. Here the statute did not require an abstract, and did not make its delivery a condition of payment. In other words, the statute did not create a "liability" against the State for this disbursement, it did not affect the value of the land, and the Court of Claims had no power to award it. The trial court found in State's finding 15 that the amount expended for dredging in the Hudson river, $16,437.64, was included in the total expenditures by the claimants before mentioned, and by corresponding finding 18 refused to find that this amount did not affect the value of the property taken by the State. In other words, the trial court charged this sum against the State in determining the improvements made upon the land. The land on which this dredging was done was owned by the State, the work was done without its permission, and ultimately it was abandoned upon the direction of the State. The claimants contend that the dredging was justifiable because they had a permit therefor from the Federal government. It may be presumed that the Federal authority gave consent to the dredging, because navigation of the river was not obstructed thereby; but it is not contended by any one that the Federal government owned or otherwise controlled the land where the dredging was done. Thus the claimants seek to increase their claim by an expenditure for work illegally performed on the State's land, although transportation on the river, or the land in question, was not improved thereby. There seems to be substantial authority to support the rule that an owner cannot claim in condemnation for expenses incurred by him in the doing of an unlawful act. (*Matter of Coady*, 146 App. Div. 585; *Matter of Daly*, 45 id. 622; *Matter of Department of Public Parks*, 53 Hun, 556; *Burke* v. *Sanitary District*, 152 Ill. 125.) But it is urged that the evidence on the expense of dredging was admitted without objection on the part of the State's counsel. The State's liability is not determined by oversights, omissions or waivers of counsel, but by statute. And that liability must be clearly expressed and strictly construed. (*Sherlock* v. *State*, 198 App. Div. 494; *Miller* v. *State*, 231 id. 363.) Section 26 of the Court of Claims Act provides that no award shall be made against the State "except upon such *legal evidence* as would establish *liability* against an individual" in a court of law. The State did not appropriate a channel dug in its own lands by the claimants; and the parties are here contending over their legal rights, where equity jurisdiction is not involved. If the dredging had been completed to a point which increased the usable value of the land and aided in transportation therefrom, a much more plausible argument could be presented. But that is not the case here. It seems quite clear that the trial court was without power to allow this item for dredging when determining the market value of the land appropriated, The trial court found for the State, finding 16, that of the aggregate sum expended by the claimants as above mentioned, there was $12,534.73 paid out for expenses in forming a corporation, for commissions on the sale of stock, for office rent and furniture, and other general office expenses, not separated. And by the corresponding request to find 21, the court refused to find that this amount did not enter into and affect the value of the property taken, and thus allowed the whole sum against the State. It is doubtless true that the expenses incurred in the development of the property may be properly considered in determining its value when taken, such as cost of surveying, or architecture and engineering, of the purchase, trial and replacement of fixtures,

55

legal expenses and payroll growing out of the work of development. This may not be said, however, of the expenses of organizing corporations, the sale of securities, the search for and collection of the money necessary for the transaction of the business contemplated, as these things have to do with the existence and standing of the corporation itself, and not with the property; they do not go into the value of the property; rather, as it were, they emanate from or are occasioned by it. This finding and refusal to find clearly comprehend items that may not be considered as a part of the market value of the property taken, and it was error so to regard and include them. (*Banner Milling Co. v. State*, 240 N. Y. 533; *United States* v. *Boston C. C. & N. Y. Canal Co.*, 271 Fed. 877, 898.) Accordingly, with these two contested items, viz., $16,437.64 for dredging and $12,534.73 for organization and general expense, deducted from the $474,681.99 above mentioned, it appears that the total cost of the structures on the land, as based on the legal evidence and found, is $445,709.62. Taking the last amount as the value of the structures, the necessary inference is that the Court of Claims awarded to the claimants as the value of the land alone the sum of $1,204,290.38. It is upon this latter valuation given to the land, apart from the structures, that the chief question in the case arises. The structural values were substantially a matter of computation. But the extremes to which the divergent views of witnesses extended in stating values, indicated that no common principle guided or limited their opinions; and the middle ground taken by the award, at such great variance with the figures stated by all the experts, cannot be regarded as based upon the legal evidence in the case. There was no question here of " going concern " value, because the quarry had never run; and the question of good will was not present, even if compensable, because the claimants had never done any business. (*Banner Milling Co.* v. *State, supra*, 539, 540, 543–545.) Thus there was nothing left for consideration by the court except the value of the land, as the same was enhanced by the structures thereon. The Court of Appeals has made it plain that proof separately taken of structure and of land values is a correct way to determine damages in condemnation. (*Matter of City of New York*, 198 N. Y. 84, 87, etc.) And on the prior review in this court, the opinion made it clear that that was a proper way to prove the values in this case (*Sparkill Realty Corporation* v. *State*, 238 App. Div. 656); and the reason for following that method here is evident, where there were structures of large value and capable of exact proof. If that course had been pursued in this case, it would have removed much of the difficulty already experienced in reaching a final determination. The claimants, in the exercise of their right to do so, refrained from offering direct proof of the value of the land itself, and did not cross-examine the State's witnesses as to sale price of similar lands; and as a result now the court is left with meager evidence of the prevailing prices and the common values of stone land along the Hudson. The values stated by the expert witnesses of the claimants ranged from $4,000,000 to $4,800,000; and on cross-examination one of the State's witnesses placed the value as high as $1,450,000. But all of these opinions were in answer to the hypothetical question hereinafter referred to. It is patent that these answers were the result of the assumptions required in the question; and there is no other evidence to form a basis for any approximate values; and the award is greatly in excess of any value given otherwise. It is thus seen that the award is rooted in these answers. On the prior review, when the judgment was reversed,

the hypothetical question was regarded as "unobjectionable" when considered in connection with the contract items being discussed at that point in the opinion. In so far as the question assumed the property in question, the quantity of stone, a partly installed plant, which, when completed at a specified cost, would have a given capacity, and also an existing market, it was likewise free from objection. But the question then required the witnesses to assume that the claimants could quarry and crush, and deliver in New York, 750,000 cubic yards of crush stone annually, at an average cost of one dollar and ten cents per cubic yard, and sell this output in the market, and secure an average price of one dollar and ninety cents a cubic yard, and to assume that claimants could maintain this production, delivery, average cost, sales and average price over a period of twenty-five years. The question definitely assumed the future production, sales and profits over the period mentioned, although the claimants had never operated such a business. Proof of the prospective profits of the claimants was inadmissible, and the answers to the hypothetical question should have been excluded. ( *United Fuel Gas Company* v. *Railroad Commission*, 278 U. S. 300, 317, 318; *N. Y. C. R. R. Co.* v. *Maloney*, 234 N. Y. 208, 218: *Matter of City of New York, supra*, 86–88, 90–92; *Robinson* v. *N. Y. Elevated R. R. Co.*, 175 N. Y. 219, 221, 222, 225; *United States* v. *Boston, C. C. & N. Y. Canal Co., supra*, 877, 886, 898; *Orleans County Quarry Company* v. *State*, 172 App. Div. 863; *Matter of N. Y., L. & W. R. Co.*, 33 Hun, 639, 644, 647; *Matter of Board of Water Supply*, 121 Misc. 204; affd., 209 App. Div. 841; *Matter of City of Rochester*, 234 id. 583, 586, 587; *Matter of City of Syracuse* v. *Stacey*, 45 id. 249, 255, 259; *Matter of Gilroy*, 26 id. 314, 315.) It may be observed further that the hypothetical question, in the form presented and in so far as it contained the elements last mentioned, was not a proper subject-matter for opinion evidence. It was a mere problem in arithmetic. In substance, the question assumed a given quantity, the cost of production, and the sale at a given price, the result of which was a mere matter of computation, as was the capitalization based on this computed and prospective annual income. The witness Buckbee assumed the quarry, when completed at an added expense of $500,000, could earn $500,000 to $600,000 a year, and accordingly was worth $4,700,000. The witness Cushing testified that the claimants could earn $500,000 a year, and "with an assured income of 10%," it was worth $5,000,000. His testimony showed a little more clearly than the others his method of computation, and it was stricken out. The witness Brewster based his opinion upon the same prospective operations, and then included in his valuation the consideration that the land would be worth $2,000 an acre after the mountain was removed. And the court itself said: "We think that prospective profits are some evidence of value. We have already ruled that." The view is inescapable not only that the question called for a computation of future profits, but that the witnesses stated their conclusions on that theory. It is thus seen that the court admitted and considered not only evidence of future profits of claimants who had never done any business, but based those profits on the maintenance of average cost and average selling prices in the future over a period of twenty-five years, facts not capable of proof. It is urged by counsel for claimants that the State resorted to hypothetical questions of the same general character as that of claimants, and accordingly is precluded from raising that point now. The trial court having overruled the proper objections to the hypothetical question, the State was free to resort to the same method of proof, without losing the benefit of its exception

properly taken. (*Douglas* v. *N. Y. Elevated R. R. Co.*, 14 App. Div. 471, 473.) The legal and factual evidence, and the grossly excessive amount of the award, indicate that the case was decided on a wrong principle. The property was bought when idle for $30,000, or less, in 1914, and continued idle and unimproved thereafter; it was assessed for tax purposes at $15,000 at the time of appropriation, and for years before; it was appraised by its owner successively at $50,000, $100,000 and $150,000 at different times during the five preceding years; the rise in the value of stone land in Rockland county did not exceed ten per cent after such appraisals; stone land is sold by the acre, and the usual price per acre ranged from $100 to $600; other quarries making crush stone, including trap rock, were running part time; other coarse aggregates, in competition with trap rock, were acceptable and more extensively used. It is common knowledge and evident to the most casual observer that a great extent of the Hudson river for a hundred miles from its mouth is skirted by vast areas of rock land; and the witnesses who considered the value of the land, apart from the structures thereon, fixed the fair market value at a sum not exceeding $120,000. Despite this factual evidence, however, the award by necessary inference assigns to the land alone a value of ten times the amount stated by the witnesses on that aspect of the case, a value perhaps twenty times the usual price of stone lands on the Hudson river, and nearly forty times the cost to the owner, and nearly eighty times its assessed value. These considerations, in connection with the whole record, render the conclusion irresistible that the case was decided upon a wrong principle, and that the award is shockingly unjust to the State. The judgment should be reversed and a new trial granted. [148 Misc. 626.]