SPARKILL REALTY CORPORATION and STANDARD TRAP ROCK CORPORATION, Respondents, *v.* THE STATE OF NEW YORK, Appellant.

(Claim No. 19587.)

Third Department, April 27, 1938.

*John J. Bennett, Jr.,* Attorney-General [*Henry Epstein, Solicitor-General, Walter H. Pollak,* Special Assistant Attorney-General, *Leon M. Layden,* Second Assistant Attorney-General, of counsel], for the appellant.

*Henry J. Hemmens* [*Jackson A. Dykman, Benjamin McClung* and *Sigourney B. Olney* of counsel], for the claimant-respondent Sparkill Realty Corporation.

*Cullen & Dykman* [*Jackson A. Dykman, Benjamin McClung, Sigourney B. Olney* of counsel], for the claimant-respondent Standard Trap Rock Corporation.

HEFFERNAN, J.   The State of New York is appealing from a judgment of the Court of Claims awarding respondents $1,333,209.62, together with interest of $630,830.35 and an additional sum of $5,000 for procuring an abstract of title, amounting in all to $1,969,039.97.

This cause has a colorful history.  Respondents, domestic corporations, respectively, are owner and lessee of land located at Piermont, Rockland county, N. Y., on the bank of the Hudson river, about eighteen miles from the city of New York.  The property comprises about 164 acres, of which 110 acres are upland, containing deposits of trap rock, and the remaining 54 acres are marsh lands, which from time to time are flooded by the river.

Respondents had begun the development of a stone quarry on the premises.  For that purpose respondent tenant upon land of respondent owner had erected a plant which was substantially completed and which would have been ready for operation on March 15, 1929.

On October 11, 1928, the appellant, under the provisions of the Conservation Law, appropriated these lands for an extension of the limits of the Palisades Interstate Park.

Respondents filed a joint claim for damages.  After a trial the Court of Claims on August 5, 1932, made an award in their favor of $1,650,000, together with the sum of $5,000 for an abstract of title (*Sparkill Realty Corporation* v. *State of New York*, 148 Misc. 626).  Upon appeal this court, with two justices dissenting, reversed the judgment and ordered a new trial on the ground that an improper item of damages was included in the award (238 App. Div. 656).  Upon a retrial the Court of Claims rendered a judgment for respondents in the identical amount awarded on the first trial.  Upon appeal this court, with a single dissent, affirmed that judgment (242 App. Div. 862).  The Court of Appeals, by a vote of four to three of its members in an opinion by Judge LOUGHRAN, reversed our determination and granted a new trial (268 N. Y. 192).  The reversal in the Court of Appeals, as evidenced by the language of the opinion, was predicated upon error in allowing the hypothetical question put to respondents' witnesses on the question of value.  In discussing that subject Judge LOUGHRAN wrote:

" The claimants submitted no proof of the market value of the land as such.  Instead they offered evidence that above mean high-water mark on the property are 15,314,221 cubic yards of quarriable trap rock which would yield 27,365,997 cubic yards of broken stone of a quality up to standards prescribed for customary uses of trap rock, and evidence that by an additional expenditure

of $503,471.30 the plant of the claimant lessee could have been equipped to quarry, crush, store and load on scows 750,000 cubic yards of crushed stone annually. These facts were then assumed in a hypothetical question put to each of four expert witnesses for the claimants. The further form of the hypothesis was as follows: ' Assume the stone could be quarried, crushed and loaded on scows at the quarry at an average cost of 70 cents and at an average freight cost of 40 cents per cubic yard, or a total of $1.10 per cubic yard, delivered in scows alongside docks in the Metropolitan New York and New Jersey district, which cost includes maintenance, taxes, depreciation and depletion. Assume 750,000 cubic yards of broken stone at least from this quarry can be marketed in this district annually at an average price of $1.90 per cubic yard alongside docks in scows. What, in your opinion, was the market value of the property and existing improvements on the day of entry and appropriation, October 11, 1928, that is to say, the amount in cash which a willing purchaser would pay and a willing seller would take? ' The testimony so elicited appraised the value of the property in figures ranging from $4,331,027.30 to $4,800,000. * * *

" The hypothetical question, although in the end it called for testimony in the guise of opinions as to market value, could have been answered only on the fixed assumption that the property of the claimants was to have been operated for a generation at an annual profit of half a million dollars. * * *

" The only other evidence of market value was that offered by the State. Tested by that evidence the award is grossly excessive. * * * It is apparent, we think, that this award was made upon a conclusion conjectured from data founded only in speculation."

Thereafter, by stipulation of the parties, the issues were referred to a distinguished former chief judge of the Court of Appeals, and an experienced judicial officer, as official referee, to hear and report. He recommended the award now before us. His report was confirmed by a divided vote in the court below which made findings of fact and conclusions of law upon which judgment was entered. The State has again appealed.

Strange as it may appear although only a question of damage is involved almost a decade has elapsed since respondents were deprived of their property by the sovereign power in the exercise of the right of eminent domain and still they are journeying from court to court in an effort to obtain compensation to which they are rightfully entitled. The end of the litigious travail is not yet in sight.

The judgment under review should not be disturbed unless it clearly appears that it includes unlawful, or excludes lawful, elements of damage or unless it is tainted with unmistakable legal error. The value of property taken in condemnation proceedings is a question of fact. (*Matter of City of New York [Fourth Ave.]*, 255 N. Y. 25.) It is settled beyond question that respondents are entitled to recover the fair market value of their property based on the most advantageous use to which it could be put. In this case appellant occupies the status of a purchaser. (*Jackson* v. *State of New York*, 213 N. Y. 34.) In order to arrive at an estimate of the fair market value of the property in question all those things which would be considered by a buyer and seller, neither under compulsion, neither having an advantage over the other, must be taken into consideration by a witness competent to assemble, weigh and translate them into dollars and cents. All the facts and circumstances which a buyer and seller would consider in connection with the purchase and sale of a piece of property are relevant and material in arriving at a determination as to its market value. Exceptional circumstances exist in this case. The property which is the subject of this litigation — a quarry and an uncompleted plant — is not the subject of barter and sale in any general market and obviously its value is not to be determined upon evidence relevant in cases involving residence, business or similar property. Fair value in this instance, neither being under duress, is the sum of money a willing purchaser of such a plant and quarry would pay and a willing seller would accept. When the State deprives the citizen of his property for a public use he should have the right to prove every element that can fairly enter into the question of market value. (*Matter of City of New York*, 198 N. Y. 84.)

It is the contention of appellant that the value of the property does not exceed the sum of value of the land as a naked site and the value of the improvements. The proof of appellant is to the effect that the maximum value of the land alone is $120,000. It is not questioned that the value of the structures thereon was $445,709.62. Appellant, therefore, urges that the total of these figures, or $565,709.62, represents respondents' damages. The referee held that respondents were entitled to recover the value of the structures and also the value of the land enhanced by the improvements which respondents had erected thereon.

The court below found upon sufficient evidence that respondents, at the time of the appropriation, had substantially completed their plant which conformed in design, material and arrangement to modern and efficient methods of stone crushing; that it was well

designed, equipped and adequate; that it had a capacity for crushing, conveying, storing and loading approximately 750,000 cubic yards of trap rock from the quarry annually; that the 110 acres of upland contained 15,314,221 cubic yards of trap rock in place above sea level which when crushed would yield a minimum of 27,365,997 cubic yards of crushed stone, meeting standard specifications in New York and New Jersey and those generally prescribed for commercial purposes, readily and practically available for quarrying and crushing and transportable by water to the metropolitan district for a trifling cost; that at such time 10,800,000 cubic yards of coarse aggregates were sold annually in this district, of which between 4,000,000 and 5,000,000 cubic yards were crushed stone, at which time the demand was increasing and trap rock was desirable because of its toughness, hardness and wearing qualities; that there was a market in the metropolitan district in which stone from the appropriated property could be sold and marketed at a profit; it was also found that the actual cost of the plant and equipment had the same been completed and installed would have been $1,087,731.95.

Respondents swore three expert witnesses on the question of value. To discuss the evidence in detail would extend our views beyond reasonable limits. We shall, therefore, but briefly refer to the testimony. In response to a hypothetical question one of these witnesses fixed the value of respondents' property at the time of appropriation at $1,946,528.70; another at $1,996,529, and the third at between $1,996,529 and $2,496,529. Appellant criticizes this evidence and argues that it is based upon conjecture as to profits and that the data upon which the witnesses relied are speculative and conjectural and that consequently the responses of the witnesses are based upon an assumption of a fixed annual profit from the quarry operations. We cannot acquiesce in this view. Not only did the witnesses deny that they took such an element into consideration but the question propounded to them specifically excluded such an assumption. We agree with the referee that the hypothetical question was free from the objections condemned by the Court of Appeals in the former appeal. As said by him, it " included no element of good will and no assumption that the operation of this property would produce certain profits during a period of many years." Respondents' witnesses did take into consideration, and they were justified in so doing, the value of the trap rock and the profitable operation of the plant. Certainly a prospective purchaser and a seller would have in mind the possibility of profit to be derived from the operation of the plant. It was not an assumption of profitable operation but an assumption

of a *fixed profit over a period of years* which the Court of Appeals rejected. Nowhere in the opinion of Judge LOUGHRAN is there any intimation that the court intended to exclude from consideration the possibility of profitable operation. The condemnation of the former judgment in the highest court was based not upon a profit but upon an *invariable* profit over " decades to come." The true value of property depends upon its development and arises out of it. Judge LOUGHRAN evidently had that in mind when he wrote: " Before the taking, a willing buyer could have acquired at best an unfinished plant and the opportunity to operate it after completion. To the full market value of that privilege the claimants were entitled, but to nothing more." It has been held again and again that in order to arrive at market value all those things must be taken into consideration which would be present in the minds of a buyer and seller. " These are things which a seller and a purchaser would consider on a sale." (*Banner Milling Co.* v. *State of New York,* 240 N. Y. 533.)

In eminent domain proceedings one who is deprived of his property should be permitted to prove all factors which are relevant in fixing its value. There is no well-considered case which holds that profits may never be considered as an element of value. Profits may be recognized as an important item and are only excluded in cases where the evidence is too speculative. " Each case necessarily involves different facts and must be considered by itself. Only a few general rules apply on the question of valuation in condemnation proceedings, and even these may yield to exceptional circumstances." (*Banner Milling Co.* v. *State of New York,* *supra.*) The usable value of the property for any suitable legitimate business is always relevant in fixing its market value. (*Reisert* v. *City of New York,* 174 N. Y. 196; *Baumann* v. *City of New York,* 227 id. 25.) The prospective use of the property and its potential value for such use may be considered. (*Balshan* v. *State of New York,* 230 App. Div. 142; affd., 255 N. Y. 596.) As was said by the court in *Langdon* v. *Mayor, etc.* (133 N. Y. 628): " But it is the potentialities of a given piece of property, both developed and undeveloped, which constitute its chief element of value." The value of the trap rock and the reasonable probabilities of the profit to be derived therefrom are elements which it may be assumed a prospective purchaser would take into account in fixing the value which he would be willing to give for the property. The value of the land and the cost of the structures thereon do not necessarily establish market value. (*Banner Milling Co.* v. *State of New York,* *supra.*)

The expert testimony received in this case while not competent for the purpose of showing the amount of profit, was properly received for the purpose of establishing that there could have been a profit. (*Matter of Commissioners of Palisades Interstate Park* [*Nos. 1 & 2*], 164 App. Div. 957.) In our opinion the referee committed no error either in the reception of evidence or in the construction which he placed upon it.

Much is made of the fact by appellant that the president of respondent owner purchased this property in 1909 for $18,000. This circumstance is not very impressive. Paraphrasing the language of the referee it may be said that at that time no structures had been erected on the property and so far as appears no plans had been perfected for turning this barren land into a trap rock quarry whereby its value might be greatly increased.

Appellant also stresses the claim that at various times during the years 1923 to 1925 respondent owner offered to sell the undeveloped property for $50,000, for $100,000 and for $150,000. The answer to that argument is that not only did the owner deny any offer to sell at the figures given but the court below has now twice refused to find that he made such offers. It was the function of that court to pass upon the credibility of the witnesses and the proof on that subject is not sufficient to warrant us in holding that the finding is against the weight of the evidence.

Appellant also urges that the land and improvements should have been separately valued by the expert witnesses and that the trial court should have made separate findings of value on land and structures respectively. The law does not make such form of proof or findings obligatory. In fact in this case such proof would not be calculated to show the true value of the property. In his report bearing on the question of value we are impressed by the following statement taken from the referee's report indicating his views on that subject: " I think that many features, most of which have been referred to, made the Pierremont site for a trap rock quarry an available and valuable one and in considering this question, while of course I am not controlled by their [the witnesses'] views of value, I have naturally and properly studied with care what has been said by other courts and especially the last words spoken by the Court of Appeals in passing upon this valuation on prior hearings. There is no formula by which it can be mathematically demonstrated what this site with its improvements was worth. All that I can do is to exercise my best judgment on all of the evidence which has been presented to me and doing this, I think that the sum of $1,333,209.62 is a fair valuation for the land and improvements of claimants taken by the State and I so report."

Finally it is urged that the court erred in allowing respondents $5,000 for a title search. This court is committed to the proposition that such an allowance is proper (238 App. Div. 656). It appears, however, that the amount of this item has been twice allowed by the court below. The court approved the award of $1,333,209.62 recommended by the referee. In addition it awarded $5,000 for the search. The item for the search had already been included by the referee in the amount expended for improvements. Concededly the amount expended for that item was $445,709.62. The referee states it to be $450,709.62. It is quite obvious that he added to the other items the amount expended for the search.

We believe that the judgment appealed from is correct and should be affirmed, with the exception that there should be deducted therefrom the item of $5,000, and as so modified, the judgment is affirmed, with costs.

HILL, P. J., and RHODES, J., concur; McNAMEE, J., dissents, with an opinion in which BLISS, J., concurs; BLISS, J., dissents, with an opinion.

McNAMEE, J. (dissenting). This case is here on review for the third time, and the main ground urged on each of those occasions has been the shocking excessiveness of the award. On the last appeal to this court, the writer felt compelled to dissent and voted to reverse (242 App. Div. 864, 868). In addition to the extravagance of the award for the land, that dissenting opinion discusses a charge of $16,437.64 for unlawful dredging on the State's land, and another item of $12,534.73 for expense of forming a claimant corporation. It seems that these two items were abandoned and not allowed on the last trial. In other particulars, no reason appears for altering the views expressed in that opinion, or the cases which document that dissent.

Reference is made to that opinion for the evidence, the reasoning, the statutes, and cases which condemn the allowance of $5,000 for a title search. On the reversal of this court (268 N. Y. 192), the Court of Appeals discussed only the question of the basic reversible error on the larger question of land value.

The lands in question consisted of 110 acres of rock land and 54 acres of marsh. They were bought by the claimant owner in 1909 for $18,000, were " idle, unimproved and unprofitable," and they so remained until taken by the State. They were assessed at $14,540, and from 1923 to 1928 different prices for sale purposes were stated by the owner ranging progressively from $30,000 to $150,000. There is no proof in the record that the plaintiff could have sold these lands for a sum in excess of any of these prices. On the

former trials the Court of Claims gave a value to these lands of more than $1,000,000.

On the last trial a divided Court of Claims followed the conclusions of the official referee in his report, and gave as the value of the lands in question $880,000, and $8,000 per acre for the uplands.

The value of the improvements on these lands is not in dispute, and it amounts to $445,709.62. An allowance was made by the Court of Claims of $5,000 for making a title search; and the total award was $1,333,209.62.

The official referee rejected the values as stated by experts on both sides. He seems to have declined to consider the cost of the site in 1909 as evidence, because there was no proof of value or market for trap rock in 1909, and also because the property was then " an idle, unimproved and unprofitable piece of land." Proving that streets, State roads, and construction of all kinds were being done with the use of concrete and coarse aggregate in New York and elsewhere in 1909, would be evidence only of that which is universally known and evident. And the view that the property was idle and unprofitable in 1909 coincides exactly with its condition in 1928. It had produced no crushed stone nor any income at either time. For similar reasons the assessment of the land at $14,540 was regarded as " valueless " and out of line with the other evidence. But it can be argued easily that the assessment was in harmony with the price paid by the owner of an idle and unprofitable holding, and in some degree in harmony with the owner's appraisement for sale at $30,000, and later at $50,000. The substantial disregard of this factual evidence doubtless contributed to an erroneous result.

In like manner, the assumption in the report that there was no evidence of value of other comparable quarries within a reasonable distance, does not indicate a full appreciation of the State's evidence. It appears from claimants' own witnesses that there were several other quarries in the same general section, and within easy access of the metropolitan market. And some of these were much greater in acreage and extent of stone, with plants of much larger capacity, and were owned by companies which had been doing an extensive business for many years. These other properties were carried on the books of their owners or sold at prices ranging from $150 to $1,000 an acre. And the observation that some of them had not been opened would not differentiate them from the quarry under consideration, as the claimants had neither opened their quarry nor done any business.

The report notes that the conclusions of the experts cannot be accepted, but that it is necessary " to look at the other evidence in the case as a basis for the award," which shows that the Pierremont site is " available and valuable." It is observed that plans had been prepared for a development of the quarry, and apparently these plans had been nearly half completed. But no other proof is particularized, and I am unable to find any in the record, which would give the slightest indication that the 110 acres of rock land had a value of $880,000, or $8,000 an acre, or even an approximation of such a value, apart from the deductions to be drawn from the hypothetical question.

The report summarized the evidence in the face of which the opinions of value were given by the claimants' experts. This was that the metropolitan district provided a market of 10,800,000 cubic yards of coarse aggregate, of which nearly half was crushed stone; that if allowed to complete their plant, the claimants would have been able to deliver 750,000 cubic yards of their product per year on scows at their own property (although claimants' uplands were not adjacent to deep water) at a cost of about seventy-five cents per cubic yard; that the transportation to docks in New York would cost forty cents per cubic yard; and that the market price in New York was one dollar and ninety cents or more.

It appears in the report that this evidence was not received " for the purpose condemned by the Court of Appeals; " that its purpose was confined " to the object of proving what this property was worth at the date when it was taken by the State." It would seem that the *purpose* of the official referee may not be the matter of first importance. It was the understanding by the witnesses of those facts, which were received in evidence, that was of consequence because they formed the basis of their judgment. The exact form of the hypothetical question can make little difference in such cases, when the evidence admitted by the trier of the fact and the understanding of witnesses lead practically to certain error. There can be no doubt that from the evidence and the report the witnesses understood that the claimants were going to deliver in the New York market 750,000 cubic yards a year, that the manufacture would cost seventy-five cents a cubic yard, that the shipment would cost forty cents, and that the price would be one dollar and ninety cents.

It is contended that the rule laid down by the Court of Appeals was not violated because the witness did not testify on the theory of future profits, " during a long series of years." Some of us think the rule was violated in both of these particulars. The assumption was in fact indulged that the claimants would be able

to manufacture and deliver 750,000 cubic yards a year, as well as the assumption of the profit indicated by the figures given. Neither of these is admissible. The official referee indicates the line along which his views followed, viz., that those facts were a proper consideration for determining the value " at the date " of taking. He fixed the value, and clearly did so in accordance with those views. It makes not the slightest difference whether one year, " *per annum*," or twenty-five years be the future time under consideration. It still involves the measured transaction of business in the future, and possible future profits on the part of claimants which never did any business and never made a profit. The unit of time is not important. The less becomes the greater by mere multiplication.

It will be noted that only affirmative and future possibilities were taken into consideration, and made the basis of value. No attention was given to matters of competition, industrial skill or the lack of it, the failure of the New York market to absorb claimants' product, poor business management, bad debts, bad times, financial necessities, labor disputes, or sinking boats. No element of the past or present was included, except a quarry and a half built plant; and as Judge LOUGHRAN put it, " the opportunity to operate it after completion."

Only by a consideration of such possibilities could one, on the record before us, arrive at the value found. There is no factual basis in the evidence to justify it. No owner ever realized such a value from comparable property, and only one case is known where the price received was as much as one-eighth thereof. Were this value sound, the hundred miles and more of stone land along the Hudson could not be measured by the wealth of the rajahs of India; were this value real, the reflected light of the fact would obscure the classic imagination of Washington Irving. The mind developed on the banks of the river and that has become inured to its business and industrial life, is shocked by the conclusion that stone land on the Hudson is worth $8,000 an acre. The very conclusion is proof in itself that a wrong principle has been followed.

The judgment should be reversed, and a new trial ordered.

BLISS, J., concurs.

BLISS, J. (dissenting). In addition to the reasons stated by Judge McNAMEE, in which I concur, there are certain others which appear to me to render a reversal of this judgment and a new trial necessary, much as I believe this litigation should be terminated.

At the outset I differ with the majority on their statement that the judgment under review should not be disturbed by our court unless it clearly appears that it includes unlawful, or excludes

lawful, elements of damage or unless it is tainted with unmistakable legal error. We review the facts as well as the law and the value of property taken is a question of fact. (Civ. Prac. Act, § 608.)

Next the learned official referee in stating the rule to be followed said that the claimant, in such a case as this, was entitled to recover the fair value of the improvements and also the value of the land enhanced by the improvements. He cited *Matter of City of New York* (198 N. Y. 84) as an authority to support this statement. The language of that case is as follows: " In such cases it is true that the value of the land as enhanced by the value of the structures is the total value which must be the measure of the owner's just compensation when his property is condemned for public use. * * * But when a building has an intrinsic value, which must be added to the value of the land in order to ascertain the value of the whole, the owner may not be able to establish his just compensation unless he is permitted to prove the value of his land as land and the value of his buildings as structures. By adding to each other these two quantities the result is really the value of the land as enhanced by the buildings thereon." In finally fixing the value of the premises taken the referee allowed $1,333,209.62, which he allocated as between improvements and land at $450,709.62 for improvements, $2,500 for marsh lands and $880,000 for the uplands " as enhanced by the value of the improvements." It is thus apparent that he fell into legal as well as factual error and included an element of value which did not exist. To the value of the land, which included all its potentialities, should have been added the value of the improvements, and nothing more. The rule laid down in *Matter of City of New York* (*supra*) does not support the application attempted to be made of it by the referee.

Finally the facts now presented to us differ but inconsequentially from those in the prior records. In the hypothetical question propounded to the experts for the claimant there has been a change in form but not in substance, and the facts upon which the opinions are based are practically the same as before. The claimant's case lacks the usual indicia of value. A wholly fictitious value has been built up based upon speculation as to what the property would produce by way of profits down the years. The award is still " grossly excessive " and should be reversed.

Judgment modified by deducting therefrom the sum of $5,000, and as so modified, the judgment is affirmed, with costs.