Richard S. Heller, J.
These two claims to recover damages for the appropriation of property were tried together. The evidence presented applies in large part to both cases.
*392 On November 18, 1953 the State filed appropriation maps taking permanent easements for flood control purposes, for the construction, reconstruction, maintenance and operation of walls, stream channel, conduit, work area, drainage, public and private utilities and appurtenances to all structures. There was reserved to the owner of the property the right to use the property provided the use in the opinion of the Superintendent of Public Works does not interfere with or prevent the use of and exercise of the rights appropriated. The permanent easements constituted a strip about 26 feet wide running in a southwesterly direction from a street then known as Erie Avenue but now known as Denison Parkway. The easterly line of the easements involved in these claims commences at a point in the south line of Denison Parkway about 60 feet west of the intersection of Denison Parkway and Pine Street and runs diagonally to a point in the south line of a public alley lying 165 feet south of Denison Parkway, which point is about 208 feet west of the west line of Pine Street.
The permanent easements include parts of lots 5, 6, 7 and 8 of block 65 as shown on a map of Corning made by Brewer and Canfield in 1855 and filed in the Steuben County Clerk’s office. Each of these lots as shown on that map had a frontage of about 63 feet on Denison Parkway and a depth of 165 feet abutting on a public alley with lot No. 8 having its depth running south on the west line of Pine Street.
At the time of the taking these lots were largely unimproved. A gas station was located at the northerly end of lot No. 6. On the southerly half of lots 7 and 8 there was an old opera house building which had not been used for a great many years. On the northerly portion of lot No. 8 at the southwest corner of Denison Parkway and Pine Street there was a three-story building occupied by stores on the first floor and offices on the upper floor which had been remodelled several years previously. The northerly portion of lot No. 7 was used for parking.
In 1953, Erie Avenue consisted of a west bound lane north of a railroad double track right of way and an east bound lane south of the railroad right of way. On the north side of the street opposite block 65 there was a newspaper building and an old hotel.
Arthur M. Lee and Harry J. Cox, one of claimants’ witnesses herein, were associated primarily as chain store leasing brokers engaged in finding suitable locations for such large chain organizations as W. T. Grant Company, F. W. Woolworth & Company, J. C. Penny Company, etc. The retail shopping district in Corning was located on Market Street, one block north *393 of Brie Avenue, and the locations available there were generally limited to a depth of 70 feet. About 1948, Lee and Cox went to Corning in an effort to find locations with a greater depth suitable for chain store operations as a result of inquiries by several such chain store organizations.
About 1951, the property along Erie Avenue was rezoned and there were definite indications that the railroad tracks running along Erie Avenue would be removed. In view of this situation Lee and Cox decided that the most logical area for commercial development was the northerly portion of block 65, the primary considerations being the depth of 165 feet, proximity of the area to the intersection of Pine Street and Market Street and the lack of any substantial building development in the area.
On August 9, 1951 they obtained an option on lot No. 6. On May 3, 1952 they obtained an option on lot No. 4 and a portion of lot No. 3 and on July 24, 1952, they obtained an option on all of lots 3 and 4. On August 13, 1952 an option was obtained on lot No. 5. On April 20, 1953 they obtained an option on the north half of lots 7 and 8. On May 13, 1953 title to lot No. 5 was conveyed to Lee.
This gave them title to or the right to purchase a plot at the southwest corner of Pine and Erie Avenue with the frontage on Erie Avenue of 126 feet and a depth along Pine Street of 82% feet and an abutting plot on the west having a frontage on Erie Avenue of about 252 feet and a depth of 165 feet.
In August, 1953 a lease agreement was made between W. T. Grant Company and Lehigh Beal Estate Corporation which Mr. Cox described as a corporation controlled by Lee and Cox. This lease agreement provided for the rental of a plot of land having a frontage on Erie Avenue of 70 feet and a depth of 165 feet. It recited that as an inducement to the lease, the landlord represented that a chain store tenant subject to the approval of W. T. Grant Company would enter into a noncancellable lease for a term of at least 10 years covering a new building with dimensions of 65 feet by 165 feet to be erected by the landlord adjoining the demised premises on the west and the landlord was required to commence the erection of such a building prior to April 1, 1954. It also recited as an inducement that the landlord would erect four store units for retail mercantile purposes having an aggregate frontage of 115 lineal feet along the south side of Erie Avenue, east of the demised premises. The lease agreement provided for an annual rental of $2,700 per year to commence September 1, 1954 or six months after landlord commenced construction of the building west of the demised plot, whichever was earlier. It also provided for additional rent *394 described as 6% of the cost of the erection of a building on the lot demised to W. T. Grant Company, which cost was to be paid by the landlord except that the payment by the landlord was not to exceed $320,000 and the additional rent to be paid by the tenant was not to exceed $19,200. The additional rent was to commence upon payment of sums by the landlord. The tenant was required to pay all taxes and assessments and to keep the property insured.
The title to lot 5 was transferred by Lee to Sagamore Syndicate, Inc., on August 5,1954 and title to lot No. 6 was conveyed by Emil R. Stasch, Jr., and Bertha D. Stasch, the apparent record owners at the time of the taking, to Sagamore Syndicate, Inc., on August 16, 1954, Lots 3, 4, 5 and 6 were conveyed by Sagamore Syndicate, Inc., to the claimant Mae Tañer by deed dated March 28, 1955. The right to receive compensation for the appropriation of property was assigned to the claimant Mae Tañer by the prior owners.
The southerly halves of lots 7 and 8 were conveyed to the Lehigh Real Estate Corporation by Schine Realty Corporation by deed dated April 25, 1955 and were subsequently conveyed by Lehigh Real Estate Corporation to the claimant Augusta Roth by deed dated April 29, 1955. The northerly halves of Lots 7 and 8 were conveyed by Corning Building Company, Inc., to the claimant Augusta Roth by deed dated May 4, 1955. All rights to receive compensation for the appropriation of property were assigned to the claimant Augusta Roth by the prior owners.
The permanent easements taken are so broad as to require the conclusion that so far as these claims are concerned the property is divided into two parts by the taking. The court has viewed the premises and while in fact the permanent easements have been utilized for the installation of a conduit carrying Monkey Run Creek underground with an unbroken surface there is no requirement that the State maintain the conduit in that form. Without any further appropriation it could provide an open cut for Monkey Run Creek and prevent access to the portion of the property affected north of the easement from the claimant’s property south of the easement. The reservation to the owner is of a conjectural value since the use by the owner is at all times subject to the opinion of the Superintendent of Public Works.
In effect therefore, on lots 5 and 6, the taking of the permanent easements reduced the depth of 117 feet of frontage on Denison Parkway to an average depth of 100 feet ranging from about 35 feet on the east line of lot 6 to 165 feet at a point about *395 nine feet east of the west line of lot 5. On lot 7 the permanent easement reduced the depth of about 30 feet of the frontage on Denison Parkway from 82% feet to an average of 17 feet ranging from no depth on the intersection of the west line of the permanent easement with the north line of lot 7 to 35 feet on the west line of lot 7. The permanent easement took the balance of the Denison Parkway frontage of lot 7 and about three feet of that frontage of lot 8.
The property owner who is deprived of his property in condemnation proceedings is entitled to recover the fair market value of the property taken together with consequential damage to the property remaining based on the most advantageous use to which the property could be put. (Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, affd. 279 N. Y. 656.) On this basis the testimony by claimants’ witnesses establishing the highest available use for the property before the taking is pertinent but the estimates of value by those witnesses based upon a capitalization of prospective income does not reflect the fair market value of the property prior to the taking.
At the time of the taking Lee and Cox had a right to purchase 126 feet of frontage on Denison Parkway with a depth of 82% feet extending west from the intersection of Denison Parkway and Pine Street. They also held title to or had a right to purchase property abutting on the west, having a frontage on Denison Parkway of 252 feet and a depth of 165 feet. This then was the property of which the fair market value prior to the taking must be determined. A willing buyer could have purchased at that time that plot of property subject to a lease agreement requiring the erection of a building 65 feet by 165 feet at the west end of the plot, payment of the cost of the erection of a building 70 feet by 165 feet with such payment not to exceed $320,000, and the cost of the erection of four mercantile store units east of the 70 feet by 165 feet building. For the purchase of the land with these commitments a willing buyer could be assured of an income of $2,700 per year for a plot of land 70 feet by 165 feet and 6% of whatever the cost of a building 70 feet by 165 feet turned out to be except that it could not exceed $320,000 with the annual payment not in excess of $19,200 for a term of 30 years with a right on the part of the tenant to extend for two additional 10-year periods.
At that time a willing buyer, could not rely upon total occupancy of the property by chain store tenants such as W. T. Grant Company. The evidence indicates that at the very time that the W. T. Grant lease agreement was reduced to final form in March, 1953, a proposed lease arrangement with H. L. Green *396 Company for the proposed building 65 feet by 165 feet at the westerly end of the plot was “ before the Board of Directors Yet while that property subject to the proposed deal with H. L. Green Company was not shown to have been affected by the taking, no such lease was consummated prior to the taking on November 18, 1953 and so far as the record indicates no such lease has ever been concluded. In 1955 a building 65 feet by 120 feet had been or was being erected on the plot and was under lease to two other tenants.
The W. T. Grant lease required development of the Denison Parkway frontage having a depth of 165 feet east of the Grant plot by the erection of four mercantile store units. The evidence establishes that this frontage of 115 feet was not sufficient frontage for occupancy by two chain store tenants such as J. J. Newberry Company and J. C. Penny Company even if the lease provision could have been changed to permit such use. The 126 feet of frontage on Denison Parkway at the east end of the plot was inadequate for development for occupancy by chain store tenants since there was a depth of only 82% feet which was only 12% feet more than the existing unsatisfactory commercial district in Corning. There is no evidence in the record that at the time of the taking, the owners of the northerly halves of lots 7 and 8 could ever acquire the southerly halves of those lots. The inability to acquire the southerly halves of lots 7 and 8 was in no way related to the appropriations, and negotiations with F. W. Woolworth & Company were abandoned prior to the taking due to the unavailability of lots Nos. 7 and 8 to the full depth.
Furthermore this property was not unique in availability for this type of development since the record indicates that J. C. Penny Company and J. J. Newberry Company commenced negotiations for other property in Corning after the taking. Prior to the taking a willing buyer could have acquired, at best, property which was then essentially nonproductive and which could be made productive only by a major expenditure of funds with only a portion of the property suitable for the needs of such major tenants as large chain store operations. Claimants are entitled to an award based on the fair market value of what was available for sale prior to the taking. (Sparkill Realty Corp. v. State of New York, 268 N. Y. 192, 197.)
The testimony of both of claimants’ witnesses is essentially based upon an assumption that a plot having a frontage of 378 feet on Denison Parkway and a depth of 165 feet had unity of ownership or control. This is contrary to the fact. Both of claimants’ witnesses arrived at an estimate of the extent of *397 the damage by determining a square foot value for a plot 378 feet by 165 feet and simply multiplying that value by the number of square feet which they deemed to have been made useless for development purposes by the taking. It is apparent however, that the property owned or controlled by the claimants’ predecessors in interest prior to the taking, derived its value for retail commercial development principally from the frontage on Denison Parkway with the proximity to the corner of Pine Street and Denison Parkway. Deprivation of property located in the southerly portion of the plot could not result in damage equivalent to deprivation of property on Denison Parkway.
The opinions of value given by the two witnesses for the State however, are also unconvincing. Both of these witnesses apparently failed to consider the potential income to be derived from this property developed to its highest and best use. Such a factor is an important element in determining value on the open market. The existence of the W. T. Grant lease agreement clearly enhanced the possibility of the development of this previously untried retail location and must be considered as an element bearing upon value.
Taking into consideration all of the relevant factors pertaining to the fair market value of lot 6 and the easterly 54 feet of lot 5, the court finds that the fair market value of this plot having a frontage on Denison Parkway of about 117 feet and a depth of 165 feet and containing about 19,300 square feet was $91,224. The value after the taking, leaving 117 feet of frontage on Denison Parkway undisturbed but reducing the average depth to 100 feet ranging from 35 feet on the east to 165 feet at the west, was $68,418. The total damage suffered by the taking of the permanent easements, parcel No. 538 shown on Map No. 331 of Corning Flood Control Project, Monkey Bun, containing about 2,247 square feet and parcel No. 541 shown on Map No. 333, Corning Flood Control Project, Monkey Bun, and containing about 1,423 square feet and including all elements of damage both direct and consequential, is found to be $22,806.
The State also took temporary easements covering substantially all of the remaining area of this plot, 117 feet on Denison Parkway by 165 feet in depth. These temporary easements are shown as parcels Nos. 539 and 540 on Map No. 332 and parcels Nos. 542 and 543 shown on Map No. 334. These temporary easements were for a period of 13 months commencing on June 1, 1953 and ending on June 30,1954. The existence of these easements during this period eliminated any productive use of the property during that period. The fair rental value for the period is found to be $5,480.
*398 The extent of the damage by the taking on lots 7 and 8 to which the claimant Augusta Roth is entitled by assignment, was somewhat confused in the record by an insistence on the part of the claimants that a small triangular piece at the northwest corner of lot No. 7 having a frontage on Denison Parkway of about 31 feet and an average depth of 17% feet was rendered completely valueless since it now exists as unimproved land with a building erected to the west line of lot No. 7. The same argument on the ground of lack of access was made as to that portion of lot No. 7 which remained after the taking lying south of the permanent easement. If such lack of accessibility and complete uselessness of these two plots exists however, it was the result of the activities of claimants’ predecessors in title and not of the activities of the State. Claimants have the benefit in establishing value, of unity of title and control to all of this property but the State must likewise have the benefit of that unity and if after the event, the person exercising that unity chose to separate the ownership along the west line of lot No. 7, the claimant cannot complain that she has been left with an uneconomic piece of land at the northwest corner of lot No. 7. Had development been carried out by a single owner in accordance with the best and highest use of the property when assembled in the hands of a single owner, this Denison Parkway frontage undoubtedly had substantial value even with an average depth of only 17% feet.
The claimant Roth conveyed the balance of lots 7 and 8 to the Irving Trust Company and she has been left with a small plot of land immediately south of the permanent easement hemmed in on the south and east by property which she conveyed and on the west by property which the single owner conveyed to the claimant Mae Tañer. The access to that plot which existed prior to the taking, existed after the taking and the destruction of access was by the acts of the single owner and the claimant Augusta Roth and not by the acts of the State.
Taking into consideration all relevant factors affecting the valuation of this property, the court finds that the fair market value of the plot consisting of the northerly halves of lots 7 and 8 having a frontage on Denison Parkway of 126 feet and a depth of 82% feet, was $97,200. The permanent easement known as parcel No.- 535 as shown on Map No. 329, Corning Flood Protection Project, Monkey Run, was located on the northerly halves of lots Nos. 7 and 8 running along about 35 feet of the north line of lots on Denison Parkway and containing about 1,913 square feet of which only about 15 square feet was located in lot 8 at the northwest corner. The fair market value *399 of the northerly halves of lots 7 and 8 after the taking was $63,722. The total damage, including all elements of damage both direct and consequential is found to be $33,478.
The State also took temporary easements for a period of 13 months on the northerly halves of lots 7 and 8 and these temporary easements covered practically all of the remainder of the plot with the exception of the brick store and office building located at the corner of Pine Street and Denison Parkway and contained an area of approximately 4,775 square feet. The fair rental value for the period of the temporary easements is found to be $2,741.
The claimant Tañer is entitled to judgment in the sum of $28,286 with interest on the sum of $13,000 from October 30, 1953 to May 31, 1954 and from September 23, 1955 to the date of entry of judgment and interest on $15,286 from October 30, 1953 to July 15, 1954 and from September 23, 1955 to the date of entry of judgment.
Claimant Both is entitled to judgment in the sum of $36,219 with interest from October 10, 1953 to May 10, 1954 and from September 23, 1955 to the date of entry of judgment.
Let judgment be entered accordingly.