In the Matter of the PORT AUTHORITY TRANS-HUDSON CORPORATION, Appellant-Respondent, Relative to Acquiring Title to Real Property in the State of New York and the State of New Jersey for Hudson Tubes Purposes. HUDSON & MANHATTAN CORPORATION et al., Respondents-Appellants.

First Department, December 30, 1966.

*Whitney North Seymour* of counsel (*John A. Guzzetta, James J. Hagan, Eleanor M. Fox* and *Nancy M. Clarkson* with him on the brief) ; *Simpson Thacher & Bartlett*, attorneys; *Sidney Goldstein,* attorney (*Joseph Lesser, Milton H. Pachter* and *Robert S. Tobin* with him on the brief), for appellant-respondent.

*David W. Peck* of counsel (*Theodore N. Tarlau, L. Robert Driver, Jr., John C. Jaqua, Jr.* and *Michael A. Cooper* with him on the brief; *Sullivan & Cromwell*, attorneys), for respondents-appellants.

*Arthur J. Sills, Attorney General* (*Alan B. Handler* and *David A. Biederman* with him on the brief), for State of New Jersey, intervenor, *amicus curiæ*.

*Louis J. Lefkowitz, Attorney-General (Ruth Kessler Toch* and *Julius L. Sackman* with him on the brief), for the State of New York, *amicus curiæ.*

STEVENS, J. These are cross appeals by Port Authority Trans-Hudson Corporation (PATH) and claimants Hudson and Manhattan Corporation (H & M) and Hudson Rapid Tubes Corporation (HRT) from the final decree entered June 13, 1966, in a condemnation proceeding making awards for the Hudson Tubes Railroad and the Hudson Terminal Office Buildings, title to which vested in PATH. H & M is the fee owner of twin 22-story office buildings located at 30 and 50 Church Street, Borough of Manhattan. Special Term awarded $17,996,000 for the buildings based on a capitalization of projected net income. With that we are in accord and the award therefor is affirmed. Remaining for determination is the award to be made for the railroad, and what interest rate should govern.

Originally the Hudson & Manhattan Railroad Company (Company) owned and operated the realty owned by H & M and also the railroad owned and operated by HRT at the time of taking. Reorganization resulted in two separate corporations. Company continued its corporate existence as H & M, with HRT as a subsidiary. HRT became the owner of the damage parcels which constituted the railroad with the exception of three rights of passage and easement of which H & M was the record owner and HRT had the beneficial use. PATH took possession of this property September 1, 1962 by condemnation. Special Term awarded $55,000,000 for the railroad on the theory that its original cost should govern the determination of value. The original cost was $62,000,000. Special Term concluded that the tunnels represented approximately 50% of the value of the railroad and allowed the sum of $30,000,000 for the tunnels, $20,000,000 for the depreciated value of the remainder of the railroad property, plus $5,000,000 or 10% representing the going concern value. It was stipulated that approximately 65% of the railroad property was located in New Jersey. On such property the court allowed interest at 6% and on the railroad property located within the State of New York Special Term allowed 4% interest.

The claimants urge that the award for the Church Street property was inadequate, the award for the railroad was inadequate, and the interest allowed on such awards is inadequate. PATH on the other hand contends that the award for the railroad is grossly excessive and that the interest on any award should be a uniform 4%. PATH urges that the award should not exceed the liquidation value of the railroad which it approximates at $3,500,000.

HRT urged and urges that the award for the railroad should be based upon reproduction cost less depreciation. More precisely, HRT offered testimony that the present-day cost of constructing the railroad properties would be $521,763,469 and that the reproduction cost less depreciation on the basis of trended original cost would be $447,595,589. Using the unit price method of estimating reproduction, HRT offered testimony that the present-day cost would be $563,168,028 and that such cost less depreciation would be $488,462,153. These cost figures were based upon testimony given by members of the firm of Ford Bacon and Davis. HRT on appeal urges that the award should be increased to $127,400,000 for the railroad. It reaches this figure by averaging the lowest estimate in the record of reproduction cost less depreciation, $447,600,000 and the original cost of $62,000,000 which make a total of $509,600,000. This figure is divided by two and the resulting figure of $254,800,000 halved, which amounts to $127,400,000. The difficulty with that approach is that it is founded on no sound basis and consequently must be rejected. Thus it will be seen that PATH's approach of liquidation value and the claimants' approach of reproduction cost less depreciation and the original cost trended less depreciation are diametrically opposed.

When private property is taken for a public use, as occurred here, the law requires that just compensation be paid (N. Y. Const., art. I, § 7, subd. [a]; N. J. Const., art. 1, par. 20; U. S. Const., 5th and 14th Amdts.). When the Port of New York Authority, the parent body of PATH, was created, it was envisaged that it might be necessary or convenient for it from time to time to acquire real property or other property. More particularly the States of New York and New Jersey authorized in 1961 the development of a World Trade Center by the Port of New York Authority. They found, *inter alia,* " (2) that in order to preserve the northern New Jersey-New York metropolitan area from economic deterioration, adequate facilities for the transportation of commuters must be provided, preserved and maintained and that rail services are and will remain of extreme importance to such transportation of persons; (3) that the interurban electric railway now or heretofore operated by the Hudson and Manhattan railroad is an essential railroad company facility serving the northern New Jersey-New York metropolitan area; that its physical plant is in a severely deteriorated condition; and that it is in extreme financial condition; (4) that the immediate need for the maintenance and development of adequate railroad facilities for the transportation of persons between northern New Jersey and New York would be met by the

acquisition, rehabilitation and operation of the said Hudson & Manhattan interurban electric railway by a public agency, and improvement and extensions of the rail transit lines of said railway to permit transfer of its passengers to and from other transportation facilities and in the provision of transfer facilities at the points of such transfers (L. 1962, ch. 209; N. J. Laws 1962, ch. 8; see N. J. Stat. Ann., §§ 32:1-35.50–32.1-35.68 approved Feb. 8, 1962; see, also, L. 1961, ch. 312, for earlier legislative findings). However, it was specifically provided in connection with the condemnation of property that " the owner of any property acquired by condemnation or the exercise of the right of eminent domain for any of the purposes of this act shall not be awarded for such property any increment above the just compensation required by the constitutions of the United States and of the state or states in which the property is located by reason of any circumstances whatsoever " (L. 1961, ch. 312, § 14). The law, both constitutional and statutory, requires that just compensation, and no more than just compensation be paid. In determining what constitutes just compensation several methods of approach are possible. A brief consideration of some of them will determine whether they are feasible or conducive to the desired result.

PATH acquired by eminent domain on September 1, 1962, a railroad which had undergone reorganization as a result of a petition filed August 11, 1954, by three of the railroad's bondholders. The reorganization was terminated December 31, 1961, and title was taken by PATH less than one year later.

The Hudson and Manhattan Railroad Company (predecessor of HRT and H & M) admittedly was unable to meet its debts as they matured. In reaffirming approval of the petition for reorganization it was noted that assets available to meet the debts fell far short of the sums required, and prospects for the future were dismal (*Matter of Hudson & Manhattan R. R. Co.*, 138 F. Supp. 195 [1955]). Insofar as the actual railroad operation was concerned, the railroad had failed to earn its interest and expenses for several years. The rolling stock was old, in some instances in a hazardous condition, most of the cars having been acquired between 1909 and 1911, the most recent being 20 cars acquired in 1928. In its opinion the court (WALSH, J.) stated there was no possibility of avoiding a default on bonds due February 1, 1957 (approximately $46,339,404.62). A property amortization fund, established as required by the terms of the mortgage indentures, had been totally exhausted in 1952, and only a small part of the fund had ever been used for the intended purpose. Additionaly, there was a combined deficit of $818,857.55 comprising $406,542.55, the deficit of current liabilities, plus

$358,295 representing the minimum program of authorized expenditures to maintain and permit safe operation of the railroad. The reorganization plan proposed by the trustee in bankruptcy was submitted by the District Court, Southern District, to the Securities and Exchange Commission (SEC) for examination and report. The advisory report of the SEC thereon (38 S. E. C. Rep. 676 [1958]) approved the proposed plan with suggested minor modifications. The report discussed the continuous decline in passenger commuter traffic and noted even though fare increases had been obtained from time to time, resulting in increased operating revenues, operating expenses had increased also. Such expenses " tended to reduce the margin of operating income, leaving the Debtor with operating deficits in each year for the period 1949–1957, with the exception of 1950 and 1952 " (p. 702). The SEC report referred to a March 17, 1958 opinion report of Ford, Bacon and Davis (the same firm which testified as to reproduction costs for claimant on the trial herein appealed from) which placed a value for liquidation purposes of " $1,278,200 on the tangible railroad properties and of $525,000 on the tunnels, or a combined value of $1,803,200 " (p. 707). Parenthetically, this report and a later report of Ford, Bacon and Davis dated March 17, 1960, both submitted to the trustee at his request, were excluded from evidence on the trial in this case. This was error for reasons hereinafter stated. Reference was made to $1,700,000 spent for the purchase of 20 new railroad cars, and the fact that $500,000 cash would be provided by the Company for the working needs of HRT. The SEC report concluded the over-all valuation of the assets to be acquired by HRT amounted to $3,500,000.

In a proceeding commenced in 1959, in the United States District Court, Southern District, for approval of the plan of reorganization proposed by the trustee in bankruptcy, the court (DAWSON, J.) found the debtor insolvent and approved the plan for reorganization (*Matter of Hudson & Manhattan R. R. Co.*, 174 F. Supp. 148, affd. *sub nom. Spitzer* v. *Stichman*, 278 F. 2d 402). The court found " the value of the assets to be acquired by the Railroad Company under present and reasonably foreseeable circumstances, apart from the potential values that might be realized upon a sale of the railroad to a public agency, is not in excess of $3,500,000, and that the amount that could be realized in the event of such a sale is no more than $40,000,000 " (p. 166). The reorganization was terminated December 31, 1961.

In the condemnation hearings evidence of reproduction cost, less depreciation, and of original cost ($62,000,000) trended upwards, was offered by claimant HRT. Baldin, vice-president

of Ford, Bacon and Davis, and "group seniors" from that firm's staff testified as to estimates of reproduction cost new and less depreciation as of September 1, 1962. While subjecting Baldin to cross-examination PATH's counsel sought to introduce in evidence portions of a document dated March 17, 1960, entitled "Report, Present Value of the Railroad Properties of Hudson & Manhattan Railroad Company", and to question Baldin thereon. The document had been prepared by Ford, Bacon and Davis at the request of the trustee in reorganization and submitted to him. Objections to the offer and to certain questions with respect thereto were sustained. Similar treatment was accorded a salvage report of the railroad, dated February 28, 1958, also prepared by Ford, Bacon and Davis at the request of the trustee, submitted to him, and the substance of which, if not the actual report, had been before the SEC and the Federal court. Certain questions with respect to the report were not permitted. The trustee at the time he requested and obtained the reports was under the supervision of the court and acted for and in place of the then debtor in reorganization (see U. S. Code, tit. 11, § 110). Exclusion of the reports and the undue circumscribing of cross-examination with respect thereto, as well as certain questions seeking to elicit whether Baldin considered certain factors in reaching stated conclusions, were errors. Having expressed certain opinions, inquiry should have been permitted as to data and factors considered in reaching such conclusions (*United States* v. *Ham,* 187 F. 2d 265; 3 Wigmore, Evidence [3d ed.], § 992). The reports were relevant to the issue before the court which was to determine the value of the properties. The testimony of the witness and the reproduction cost estimate reports were so inconsistent with the earlier reports submitted by the firm that cross-examination should have been permitted to impeach the credibility of the witness (Civ. Prac. Act, § 343-a, now CPLR 4514; *Matter of City of New York* [*Brooklyn Bridge*], 50 Misc 2d 478, 480; *Larkin* v. *Nassau Elec. R. R. Co.,* 205 N. Y. 267; *Kesten* v. *Forbes,* 273 App. Div. 646).

The excluded reports also tended to prove facts differing from those asserted at the trial. If the views of the witness, Baldin, and the substance of the reports varied with the necessities of the case that could properly have been shown (*Brooks* v. *Rochester Ry. Co.,* 156 N. Y. 244, 250). The reports could also have been received as admissions against interest. Certainly such reports contributed to the position which the claimant was attempting to prove in this proceeding. Not only had the trustee ordered and accepted the reports, but actual use had been made of the 1960 report in seeking State tax adjustments. It is clear

also that the 1958 report was adopted and utilized by the railroad company in the court proceedings (cf. *People* v. *Burgess*, 244 N. Y. 472; see 4 Wigmore, Evidence [3d ed.], § 1048 *et seq.*, § 1073). Moreover, as admissions of value by the owner and the prospective amount of damages to be suffered made reasonably near the time of taking, the reports should have been allowed in evidence (18 Am. Jur., Eminent Domain, § 349; 20 Am. Jur., Evidence, § 583; *Sparkill Realty Corp.* v. *State of New York*, 254 App. Div. 78, 82, affd. 279 N. Y. 656; cf. *United States* v. *Toronto Nav. Co.*, 338 U. S. 396). Since it is concluded the exclusion of the reports was error, they are hereinafter considered as received in evidence and reference to their contents will be made as necessary or deemed advisable.

*Market Value*

The approach frequently used in determining value of property taken by eminent domain is to try to ascertain its market value. As here used this should be construed to mean the price at which an owner could have sold the property to another if the property were not taken, or " the sum of money a willing purchaser * * * would pay and a willing seller would accept " (*Sparkill Realty Corp.* v. *State of New York*, 254 App. Div. 78, 82, affd. 279 N. Y. 656). " In order to arrive at an estimate of the fair market value of the property in question all those things which would be considered by a buyer and a seller, neither under compulsion, neither having an advantage over the other, must be taken into consideration by a witness competent to assemble, weigh and translate them into dollars and cents. All the facts and circumstances which a buyer and seller would consider in connection with the purchase and sale of a piece of property are relevant and material in arriving at a determination as to its market value " (p. 82). The foregoing illustrates also a further reason why the excluded reports should have been admitted into evidence.

The difficulty in evaluating this property in terms of market value in the conventional sense, is that properties of this sort are in a sense unique and are rarely if ever bought and sold in the open market. Since the operation of the railroad, financially, was a losing proposition, any attempt to capitalize earnings as an element for consideration in order to fix a price is equally unsatisfactory. Such a method provides an alternative to market value. Past earnings would be especially significant if they tended to reflect possible future profitable operation, or if such earnings were the result of an artificial or forced restriction (cf. *Matter of City of New York* [*5th Ave. Coach Lines*], 18 N Y

2d 212). The evidence indicated that the railroad was incapable of profitable operation. Under such circumstances the concept of a willing buyer in an open market must be discarded. Ordinarily no one will buy an unprofitable venture especially where, as here, there is a prospective inability to compete successfully against other available modes of transportation.

## The Substitute Facility Doctrine

This doctrine has developed as an alternative to the market value rule. Courts have developed the doctrine " [T]o meet the unique needs of public condemnees; damages will be awarded sufficient to finance a replacement ". It is also applied when there is no ready market for certain public facilities, when market value is inappropriate, or when " the public property has a market value, [b]ut that standard is inadequate " (Just Compensation and the Public Condemnee, 75 Yale L. J. 1053). It is pointed out, however, that the rule as to damages sufficient to finance a replacement is qualified " by holding it is applicable only if a replacement is 'necessary.' Some courts have demanded in addition that the necessity be 'legally compelled ', and have granted compensation to replace only those facilities which the state or municipality was legally obligated to provide " (ibid.). Sometimes the doctrine is defined to mean the obligation " to provide such substitute facilities as are 'necessary ' to carry out the public function served by the condemned porperty " (United States v. Certain Land in Borough of Brooklyn, 346 F. 2d 690, 695). Where there is no compulsion by law, and there is none in the case on appeal (though the facility is termed " essential "), whether the facility is " necessary " becomes a fact question. Implicit in the term " necessary " under these circumstances, is some possible recognition of social needs and values.

If there were no tubes available would it be necessary to replace them with a substantially similar facility in order to absorb the flow of passenger traffic carried by it between the States of New York and New Jersey? I think not. In the peak hours of early morning traffic HRT carries approximately 20 to 22% of such traffic. This is for a relatively short period. Thereafter much of the equipment remains idle until the next peak period. From 1948 when approximately 27.7% of commuter passenger traffic was carried, to 1964 when approximately 11.4% overall was carried, there is a decline of approximately 60%. Ferries and other railroads have also shown a substantial decline and the financial condition of some of the railroads which serve as feeder lines to HRT is poor. Other modes of transpor-

tation, such as buses and automobiles, have shown a substantial increase. The use of the tunnels (Lincoln, Holland) and the bridges (George Washington and others) has increased. Each new tube addition for automobile and bus traffic was followed by a decline in passenger traffic carried by HRT and its predecessor. Hudson County, New Jersey, which supplies 45% of claimant's commuter traffic, has shown a population decline in recent years. A 20–25 year projection of population growth in the area serviced, of job opportunities, of the development of residential urban and suburban areas, of industrial complexes, highway construction and possible and probable expansion of existing facilities lead to the conclusion that replacement is not necessary. In fact, but for condemnation, this enterprise in all likelihood in the near future, would have died of malnutrition. Moreover, to make an award on the theory of a substitute facility would far exceed the just compensation required by law. It would mean the award of a sum sufficient to pay for the cost of acquiring an acceptable substitute property. It might be noted whether or not one agrees with the conclusion as to necessity, an award premised upon the substitute facility doctrine, is likely to represent a negation of the fundamental principle of what the owner has lost, and be based instead upon what the condemnor has gained.

*Reproduction Cost*

This is the basis, somewhat modified, on which claimant seeks compensation. Reproduction cost, new and with depreciation, was offered as evidence of some indicia of the present value of the property. Obviously, at most, such cost would set the upper limit of valuation. Here the original cost was also trended upwards by applying to it a trend factor to bring the various included costs up to 1962. The original cost was so remote in time it is questionable if it is of real value here. (See *Kinter v. United States,* 156 F. 2d 5; 1 Bonbright, Valuation of Property, p. 144 *et seq.*) The hypothesis in using reproduction cost is that the identical plant is to be reproduced, and that present value equals reproduction cost new less actual depreciation. In property of this nature that includes both physical and functional depreciation. (See 2 Orgel, Valuation Under Eminent Domain [2d ed.], § 206 *et seq.*) In order for reproduction cost to have validity as evidence of value, it should be shown that the property would reasonably be expected to be reproduced (*Matter of City of New York* [*Lincoln Sq. Slum Clearance Project — Maxwell*], 15 A D 2d 153, affd. 12 N Y 2d 1086; affd. also *sub nom. Matter of City of New York* [*Lincoln Sq. Slum Clearance Proj-*

*ect — Schnurmacher Corp.*], 16 N Y 2d 497). It should be shown also that reproduction at such cost figure represents a reasonable commercial investment (see *Spitzer* v. *Stichman,* 278 F. 2d 402, 410). '' Reproduction costs must be on the basis of the plant as existing at the time of the appropriation and not upon a supposititious value based upon the construction of a new plant and what it would produce.'' (19 N. Y. Jur., Eminent Domain, § 237; cf. *Matter of Board of Water Supply,* 121 Misc. 204.) Here the taking is of an entire business enterprise shown to be unprofitable. Operating income less operating expenses, plus depreciation, resulted in a constant deficit. Obviously, this is not such a good commercial investment as to provide an incentive for investment and reproduction. Since there was no reasonable showing this property could be reproduced as a good commercial investment this approach was unsound (*United States* v. *Boston, Cape Cod & New York Canal Co.,* 271 F. 877 [1st Cir., 1921]). Evidence of cost reproduction by testimony of cost reproduction studies, if at all relevant, was of little value here. Conditions precedent to its application were not shown. At most and under proper conditions reproduction cost less depreciation would not have been conclusive but only a factor to be considered (*Matter of Huie,* 2 N Y 2d 168). Evidence of losses and expenses since condemnation, if permitted, would have been relevant in the issue of possible future profitable operation, a factor which could have influenced buyer incentive (cf. *Matter of City of New York [East 42nd St. El. R. R.],* 365 N. Y. 170, affd. *sub nom. Roberts* v. *City of New York,* 295 U. S. 264).

Valuation of units or elements by reproduction-cost estimates and totaling the resulting figures to reach an amount represented as reproduction cost for the whole, resulted here in a gross overvaluation. '' The replacement-cost method is theoretically applicable to the valuation of an entire physical plant whenever the plant, were it to be totally destroyed, would be worth replacing.'' (1 Bonbright, Valuation of Property, p. 171.) If it were not to be replaced by a substantially identical property, '' the hypothesis that the value of the existing property is derivable from the current cost of constructing or buying a substantially identical property is always invalid '' (*ibid,* p. 163). The construction utilized here, with particular reference to the tunnels, would not be used today . These tunnels are much smaller in diameter than other commercial tunnels since constructed in the area, and are not readily adaptable, if at all, to modern improvements to meet present-day needs in order to make the enterprise a profitable one.

*Just Compensation*

In addition to the approaches heretofore mentioned, the securities valuation approach, the capitalization method, and consideration of cash throw-off are also sometimes utilized. Since neither of these methods is being discussed extensively, a brief reference to each is being made under the above general heading.

The term represents the constitutional and statutory mandate for indemnification of the condemnee. The property is to be valued as of the time of the taking.

'' The question is what has the owner lost, not what has the taker gained.'' (*Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195; *Roberts* v. *New York City,* 295 U. S. 264, 282; *Ringwood Co.* v. *North Jersey Dist. Water Supply Comm.,* 105 N. J. L. 165, 169.) '' What the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact — not what a tribunal at a later date may think a purchaser would have been wise to give, nor a proportion of the advance due to its union with other lots.'' (*New York* v. *Sage,* 239 U. S. 57, 61.) Since there was no ready market, or indeed any market for the subject property, market value in the ordinary sense cannot be used as a criteria of evaluation. But the basic principle of compensation to the owner to make him pecuniarily whole should control (*Village of St. Johnsville* v. *Smith,* 184 N. Y. 341; *St. Agnes Cemetery* v. *State of New York,* 3 N Y 2d 37, 41).

There was testimony (using the securities valuation approach) that the market value of the property actually condemned (including the Church Street property), with certain allowances deducted, was $16,997,782. The market evaluation of the railroad under such approach was $3,802,000. In this case, because of the relative inactivity of the stock for a period of time and the market fluctuations attendant upon prospective condemnation announcements, such an approach is less than satisfactory. (See, also, 1 Bonbright, Valuation of Property, p. 245 *et seq.*; 2 Orgel, Valuation Under Eminent Domain [2d ed.], § 220.)

There was testimony the railroad showed a constant deficit in both net income and operating income in the years prior to the take-over. Capitalization of realized earnings, or even of annual earnings reasonably anticipated (prospective income) while relevant and a proper consideration, is not a suitable criterion here. The earnings, less fixed charges, operating expenses and depreciation resulted, invariably, in railroad deficits. The realty, now owned by H & M, had to carry the

burden. Utilizing any reasonable rate to capitalize a deficit would not change this picture (cf. *Onondaga County Water Auth.* v. *New York Water Serv. Corp.*, 285 App. Div. 655). When prospective income is used as a factor in capitalization there is an element of pure speculation involved. If the earnings can be reasonably anticipated the speculative factor is minimized but not eliminated. Certain extraneous factors such as business skill and proper management remain. When the past record is one of deficit operation there is little to capitalize unless an artificial condition is created by nonrecognition of essential, or important factors.

There was testimony on behalf of claimant of cash throw-off (exclusive of capital expenses and construction) for the years 1958–1961 inclusive of $241,000, $101,000, $80,000 and $117,000 respectively, for the railroad. Cash throw-off as there used eliminated amortization and depreciation. Since operating losses existed for each of the years, the cash flow figures presumably consisted of net profit, or deficit, plus items not requiring cash outlays in the particular years, but which items were charged to operations. The figures apparently included concourse rentals as revenue, offset to some extent by expense items. The source property was transferred to H & M in the reorganization and is no longer available to HRT. The cash throw-off figures here are of doubtful value and somewhat unrealistic. If fixed obligations are not met and proper maintenance and replacement of physical properties when needed, not observed, disaster may be postponed but it is inevitable. The whole operation will eventually collapse.

Using some of the same data, for like periods, as shown in claimant's exhibit indicating cash throw-off, but including amortization, at least for 1958 and 1959, PATH offered testimony of present value as of August 31, 1962 of $1,209,134. That figure represented the witnesses' view of what a purchaser would pay assuming the railroad operating earnings, before depreciation, could be expected to continue for 15 years, without equipment replacement with an interest rate of 12%.

Returning to the principle deemed applicable here, i.e., what has the owner lost for which it should be compensated, we consider the rounded figure of $1,700,000, the cost of 20 new railroad cars. The takeover, in point of time, followed so shortly upon the acquisition that the full amount should be allowed. The cars should be readily salable, commercially, and there is little reason not to allow full value. Five hundred thousand dollars (a part of which was derived from realty funds) was given HRT to cover certain estimated operating

expenses. This also should be allowed as a full item, resulting in a total of $2,200,000. The further question is what should be allowed for salvage value for the other properties.

There was testimony by PATH's expert that the highest and best use of the railroad as of September 1, 1962, was to liquidate the property. His opinion was based upon the conclusion that continued operation as a private enterprise would result in continued monetary loss. His estimate based on the foregoing was approximately $1,022,000.

The principle enunciated in *Matter of City of New York (East 42nd St. El. R. R.)* (265 N. Y. 170, affd. *sub nom. Roberts* v. *City of New York*, 295 U. S. 264) is relevant here. In that case it was shown that an elevated railroad was incapable of profitable operations. The court held, where such is shown, that only scrap or salvage value should be allowed for its structures. Reference has already been made to allowance which should be given for the cash advance made to HRT and for the purchase of the new cars. It follows that something more than salvage value is warranted. Liquidation value becomes market value in the broad sense and is the standard properly applicable.

Claimant relied heavily upon the reproduction cost estimates prepared by Ford, Bacon & Davis as indicia of value of the railroad at the time of taking. This same company in 1958 and 1960 had prepared and submitted to the trustee in reorganization reports widely and substantially at variance with its reports and testimony in the present case. The contention that such reports were prepared in different proceedings and for a different purpose, and consequently could not be utilized or considered in this proceeding for any purpose, must be rejected. Either the reports were honest and accurate as to the facts therein stated, and honest and sincere in the opinions reflected, as of the time of submission, or they were not. A like observation might be made as to the reports submitted in this proceeding. From our early discussion of the prior reports it is apparent that the reports of March 17, 1958 and March 17, 1960 were properly admissible, (1) not as proof of their contents, but for purposes of impeachment as affecting the credibility of its authors (*Matter of City of New York*, 50 Misc 2d 478, 480); (2) such reports should have been received in evidence for other purposes as well because of the circumstances under which they came into being (earlier adverted to) and because they were adopted and used by the trustee in reliance upon their contents and the opinions expressed therein.

The opinion expressed in the letter of Ford, Bacon and Davis dated March 17, 1958, addressed to the trustee, was that the

maximum value of the "companies tangible railroad properties at February 28, 1958" was $1,278,200. To this figure, in their view, there could possibly be added a figure of $525,000, estimated economic value for continued tunnel cable usage by the telephone companies based on then current rentals.

The letter dated March 17, 1960, and accompanying report to the trustee, expressed an opinion of Ford, Bacon & Davis of an increased salvage value. The items, the basis for the opinion, were enumerated and their estimated values stated. The 20 new cars represented an added factor of value. Their opinion of total salvage value from liquidation was $2,573,800.

Ford, Bacon & Davis went further in their analysis of the situation, and expressed the view that the salvage value represented a minimum value because the public would not permit a cessation of operations and liquidations, and that the railroad's value depended upon the price it could command in a sale to a public authority. Proceeding on certain stated assumptions and probabilities, chief of which was sale to a public authority, it was the opinion of Ford, Bacon & Davis that the "present value of the H & M railroad properties, as an operating enterprise, is $8,000,000."

No satisfactory explanation appears in the record for the difference between the figures above quoted and the indicia of value testimony on reproduction estimates, as indicative of the value of the railroad.

The figure of $525,000 (economic value based on continued cable rental use) should not be added to the $2,200,000 (new cars and cash advance). It was uncertain and contingent. The testimony at trial with reference to value at the time of taking ranged, depending upon the circumstances, from slightly above $1,000,000 ($1,022,000 liquidation value) to a figure of $1,290,134 as value deferred liquidation, plus $182,000 representing present value estimated at the end of 15 years.

Here the owner of the railroad properties was relieved of the burden of continued operation of an unprofitable enterprise. Such enterprise had lately, shortly prior to takeover, been adjudged insolvent and the outlook for the foreseeable future was not good. Maintenance and replacement of physical properties, where needed, would require substantial expenditures. Even a fare increase, if the pattern of the past was repeated, while affording income support, would result in a decline in passenger carriage. The process could be repeated indefinitely. The fact that the taker in condemnation would continue to operate the railroad because it had received a possible loss offset in the proposed World Trade Center, does not increase

the actual loss suffered by the owner, nor increase the liquidation value of the property taken. While salvage value cannot be determined with mathematical precision, a reasonable figure based on all the evidence received, and which should have been received, is $1,300,000 (rounded). Adding this figure to the sum previously calculated would result in a value liquidation of $3,500,000, and such is the figure now set. To recapitulate, new cars $1,700,000, $500,000 working capital, plus $1,300,000 salvage, equal the liquidation value, which is determined to be just compensation.

Evidence was received concerning possible benefits which might have accrued from the so-called Aldene Plan, when as and if it were brought to fruition. Not much evidence was received as to the possible cost and necessary expenditures involved. No value is attributed to the properties here (as of the time of taking) because of it. At the time of taking the plan was little more than an abstraction and its possible influence and results too speculative.

In urging that the court failed to give significant weight to reproduction cost less depreciation, and that the railroad award should be increased to at least $127,400,000, claimant HRT, *inter alia*, cites *Matter of City of New York (5th Ave. Coach Lines)* (18 N Y 2d 212) in support of its position. It urges that its approach as to reproduction costs finds support therein and since HRT, like the coach lines, is an operating enterprise, going concern value should be allowed.

Going concern value seems to refer to certain intangibles in an operating business where the entire enterprise is taken (see, generally, 2 Orgel, Valuation Under Eminent Domain [2d ed.], § 214 *et seq.*). The concept represents value for an existing established business as distinguished from value for the physical properties and "is allowed on the theory that a prospective purchaser would pay more for a 'live and developed' business than for the 'bare bones' of the utility plant" (*ibid.*, § 216, p. 123). It would seem that before the concept is applicable there should be a determination the enterprise is capable of profitable operation. (Cf. *Matter of City of New York [Sixth Ave. El. R. R.]*, 265 App. Div. 200, 206.) In the cited case it was said: "If the court should determine that the Sixth Avenue Line was capable of profitable operation, *then* some fair measure of the value of the railroad as a going concern would have to be applied. Just compensation being required, the full and fair equivalent of the property taken is essential. (*Monongahela Navigation Co.* v. *United States*, 148 U. S. 312)" (Emphasis supplied.) In *Matter of City of New York (5th*

*Ave. Coach Lines*) (*supra*), the court found that claimants were entitled to reasonable fares and such fares had been denied them. It found further that claimant's capability for profitable operations, upon recognition of such right, was clearly demonstrated " and they are, therefore, entitled to going concern value " (p. 221). In the case before us it is clearly shown that HRT is inherently incapable of profitable operations. Therefore, an additional allowance for going concern value is not warranted, and the properties are entitled to liquidation value only. Going concern value should probably represent some relationship between cost of acquisition and cost of development into a profitable business. The business here seems to have been started under such severe handicaps, including its capitalized structure, that it has not been able to cast off the burden. To allow going concern value here is to place a premium on deficit operations. This should not be done. The profitable portion of the formerly united operations of real estate and commuter transportation is now being continued by H & M.

The remaining question has to do with the interest rate on the awards. The right to interest is an extension of the substantive right to recovery provided for by statute (L. 1939, ch. 585). The dispute here is as to the rate to be applied. The court fixed at 4% on the New York properties which represented 35% of the whole. We are in accord with that determination. (L. 1939, ch. 585; *Matter of City of New York* [*Lincoln Sq. Slum Clearance Project — Maxwell*], 15 A D 2d 153, 179, affd. 12 N Y 2d 1086; affd. *sub nom. Matter of City of New York* [*Lincoln Sq. Slum Clearance — Schnurmacher Corp.*], 16 N Y 2d 497.) However, 6% was allowed on the New Jersey properties. Sixty-five per cent of the properties involved are located there. PATH and the Attorney General of New Jersey in his *amicus* brief recognize the right to interest (see *State, by State Highway Comr.* v. *Seaway*, 46 N. J. 376). Both urge, however, that the 4% rate should apply to the New Jersey property as well. New Jersey urges the interest rate, equitably, should be 4% for this unprofitable enterprise and that 6% would represent a windfall. PATH expresses a similar view. HRT urges the additional compensation, represented by interest, is indemnification for delay. Interest rates have increased generally and even the 4% provided by New York statute is outdated, unrealistic and unfair.

In the view here adopted no valid reason is shown for the difference in the applied interest rates. Equitably, a uniform rate should be applied, otherwise the New Jersey property is

subject to a penalty by reason of situs. New York law establishes a 4% rate. Four per cent should be applied to the award for the entire property wherever situated.

The enabling statute under which the property was taken required that New Jersey law be applied to the property located in New Jersey (L. 1961, ch. 312, § 14) with the requirement that just compensation be paid for the property acquired by condemnation or the exercise of the right of eminent domain. New Jersey urges that market value, which in this instance is the scrap value of the railroad, is the applicable standard under New Jersey law. That the approach of allowing an award based on any theory of special value to the condemnor has been expressly rejected (*Currie* v. *Waverly & N. Y. Bay R. R. Co.*, 52 N. J. L. 381). Because of the discussion and conclusions heretofore reached, it is not necessary to discuss New Jersey law separately and at length. The principles used herein as bases seem to be in accord.

The final decree appealed from should be modified on the law and the facts to reduce the award to HRT for the railroad properties to the sum of $3,500,000, the liquidation value found for the properties, and to reduce the rate of interest on the applicable New Jersey portion of the properties to 4%, and as so modified the final decree appealed from should be otherwise affirmed, without costs and without disbursements to either party.

Breitel, J. P. (concurring in result). I concur in the result but only with great reluctance, constrained as I am by the present authorities.

I am satisfied that no precedent in this State has expressly allowed a recovery in eminent domain on value to the taker and that the authorities state the contrary. The *Matter of City of New York (5th Ave. Coach Lines)* case (18 N Y 2d 212) did give some recognition to such value. It allowed going concern value, thus recognizing that the assets taken had associated with them a selection, organization, and operating system of things and human beings which the taker desired and needed. The question, however, was somewhat obscured by the fact in that case, not present here, that a profitable return had been prevented by the prior conduct of the taker.

The essential fact in this case is that all parties agree that, so long as the tubes are capable of moving passengers across the Hudson River, they will be so used in order to avoid the expense of the addition of new and substitute facilities to accomplish the same end. To that extent there is value to the

taker and, indeed, that may be the only reason for the taking. There is an obvious ceiling to the value that anyone interested in using the tubes would place upon them. That ceiling is the cost of providing transportation in substitution to that available through the tubes. As to this, no proof was offered by any party in this proceeding.

There is no point to a burdensome elaboration of the economic principles involved. But it is worth noting that those principles have received recognition in situations that compelled acceptance of the obvious economic fact that an asset that has value to anyone (that is, for which there is a demand) is an asset for the taking of which the owner is entitled to "just compensation". General market value, as has been noted so many times, is not the only basis for determining value. It is only the best way. Hence, the problem is oversimplified if it is concluded that value to the taker in eminent domain is no index to market value (4 Nichols, Eminent Domain, § 12.2, pp. 41, 47; *United States* v. *Certain Property, etc.*, 306 F. 2d 439, 447 [C. A. 2d, FRIENDLY, C. J.]; see, also, *Matter of Huie*, 2 N Y 2d 168, 171. Compare *United States* v. *Cors*, 337 U. S. 325, 332, 333, in which it is explicitly stated that market value, when available, is not identical with just compensation and in which there is also a statement of the traditional preclusion of value to the taker). In other States, several cases have arisen involving the condemnation in eminent domain of public utilities that had become unprofitable and with no economic prospect of being made profitable. To that extent, the economic problem is the same as that in this case. The courts, in these rare cases, held that under such circumstances the value to the taker was to be considered and, as a facet of that value, the cost of necessary substitute facilities (e.g., *Re City of Eureka*, 19 Cal. R. C. D. 952, 957-958; *Matter of City of Oroville*, P. U. R. 1922 E 451, 469–471; but, see, 1 Bonbright, Valuation of Property 442–443).

Some of the leading authorities have also referred to the problem presented by hopelessly unprofitable enterprises which nevertheless have a value in their continuance by government in order to avoid greater expense in the substitution of new or different facilities (2 Orgel, Valuation Under Eminent Domain, § 217; 1 Bonbright, *op. cit.*, *supra*, 442–443).

On no view of the matter should the question be confused with the replacement of substantially similar facilities. Of course, no one would duplicate the existing tubes. Nor is it disputed that substitute facilities of a different character would have to be supplied if the tubes are not used at all for the

movement of passengers. Those substitutes might consist of additional tubes to the existing tunnels, the addition of lanes to the existing bridge across the Hudson, or whatever the ingenuity of man might suggest to transport those who would otherwise have used the tubes. One thing is clear: there would be some cost or expense involved in moving the additional passengers over existing or substitute facilities. In this connection, one does not have to speculate as to whether government would make the moves necessary to utilize the tubes or to provide a substitute facility. Recent history and the circumstances of this case demonstrate that such action has occurred.

STEUER, J. (concurring). I concur not only in the result but also in the implicit findings of the majority opinion and the reasoning that produced the conclusions. That opinion, probably very wisely, does not advert to an argument which, though never advanced by the claimants, I believe to be inherent in their contentions and, in fact, the only substantial argument that could be advanced in support of their claim for additional compensation.

That argument is this: When a utility company performs a necessary public service, which some branch of the government will have to perform if the utility goes out of business, it has a potential customer for its business and the market value of its property is what the branch of government would pay for it. A more conclusory statement of the same argument would be that the franchise to supply an essential service is a compensable asset regardless of whether the service is or can be profitable to the company rendering it. It should be understood that the circumstance that this underlying argument is stated in more precise terms than counsel deemed advisable to incorporate in their briefs, means merely that it is recognized but not that its validity is accepted.

It cannot be disputed that there is no constitutional or legal obligation on any branch of government to supply the service previously supplied by the claimant. The fact that a governmental agency was empowered so to do does not indicate the existence of any such duty. The stockholders were never in a position to confront any government or governmental agency and say, in effect: We are no longer able to maintain the property with which this service is supplied, so you must supply the service, and the most economical way of so doing is to buy our installation. So that the possibility of government operation never constituted an enforcible right which might either

be sold or relied on as a guarantee of receiving a sale price which reflected the operation of a business. Nor does the fact that railroads in many instances have received subsidies in one form or another establish any right or provide any basis for calculating the income of the road as if such a subsidy had been granted. The implications embraced in the concept of a right to subsidies involve basic and radical changes in our whole economic and social structure. To premise that such subsidies are to be considered in lieu of income is therefore impermissible. So, consequently, a conclusion that this railroad would be a profitable enterprise if subsidized is not even to be considered, much less assumed.

Even if it be assumed that it was a reasonable expectation that the governmental authorities would not allow the service to cease (that is, they would perform it themselves if no private person would), this expectation would not be a compensable asset. It is not necessary to repeat here the uncontested facts in the record, ably and amply set out in the majority opinion, that the prospect facing the stockholders of the claimant was complete loss of their investment as a result of the continuing losses from operation. This is what happened to those who were stockholders prior to the reorganization, and that it would be the fate of the present stockholders, absent condemnation, is virtually inevitable. How can it be assumed that the governmental authorities would intervene to preserve the service for those using the service, at any time prior to the final bankruptcy? No authority stepped in before the earlier stockholders were wiped out. Had the authorities waited, the plant could have been acquired at scrap value and the realization of this sum before it was entirely dissipated is all that the stockholders could reasonably expect. So under no theory of economics or accounting that has been called to our attention can the possibility of governmental acquisition be deemed an asset.

The application of the cost of an alternate method of supplying the service, that is, transporting the persons using the tubes, ties in with the above. This would be a maximum or ceiling recovery based on the theory that the condemning authority would not be obligated to pay more than that for supplying the service. But before this method of compensation could be invoked it would be necessary to show that there was an obligation to continue the service, and that the cost was less than what the facilities of the claimant could command in eminent domain proceedings. That is on the theory that the condemning authority would be entitled to perform the service

enforced upon it by the most economical method. In any event, as the measure of compensation is the loss to the claimant, it is doubtful whether this method of compensation would have application in any situation except where the claimant utility was obligated to cease operations for other than financial reasons. Therefore, any such figure could not be significant here, as it could only be used if a proper award for the claimant's plant exceeded the cost of the substitute facility. That is not the claim here.

The dissenting opinion and the reluctance expressed in Judge BREITEL's concurring opinion appear to draw their inspiration from an idea that confining claimant's award to liquidation value works a hardship on claimant and constitutes a windfall to the Authority, with the consequence that the result is unfair. Such a conclusion loses sight of the realities. The beneficiaries of the award, after payment of the corporate debts, will be the stockholders of the railroad. By virtue of the reorganizations through which the corporation has passed these are not the people whose investment built the road, but rather the various classes of creditors whose claims were converted into stock and people who bought stock from them for speculation. The record shows that the value of the stock on the market was $16,400,000 before condemnation was announced and fluctuated thereafter with the progress of the litigation, reaching a high of $27,100,000 when condemnation became a certainty. Instead of a value of $27,100,000, the dissent would provide a fund in excess of $61,800,000 or a windfall of over $34,000,000 to those speculators as a reward for their perspicacity and a corresponding penalty to the Authority for undertaking the performance of a service which will be a continuous drain on its resources but will relieve the stockholders from the loss of their investment. Though it is inevitable, at times, that the established rules for determination of just compensation will provide a somewhat more fortunate result to the holder of its property taken than the ordinary commercial course would lead one to expect, it is difficult to understand why these rules should be abrogated or changed to produce the result contended for.

RABIN, J. (dissenting in part). The petitioner, the Port Authority Trans-Hudson Corporation (hereinafter referred to as PATH) took, through condemnation, an active going essential transit facility for continued use as such and yet the majority of this court has come to the conclusion that the claimant, Hudson Rapid Tubes Corporation (hereinafter referred to as

HRT), from whom such property was taken, may only get "liquidation value" which, in effect is salvage value, by way of compensation.

I dissent because I think there is no justification for such conclusion, and also because I believe that the amount awarded does not fulfiill the constitutional requirement of just compensation for what was taken.

That the property taken was and is an active going transit facility is obvious. It was condemned for continued use as such and is now being so operated. That it is an essential facility can hardly be disputed. The Legislatures of the State of New York and the State of New Jersey, in authorizing the acquisition of this railroad found, among other things,

"(2) that in order to preserve the northern New Jersey-New York metropolitan area from economic deterioration, adequate facilities for the transportation of commuters must be provided, preserved and maintained and that rail services are and will remain of extreme importance to commuter travel;

"(3) that the Hudson and Manhattan railroad [the property condemned] is an essential railroad facility serving the northern New Jersey-New York metropolitan area". (L. 1961, ch. 312, § 1.)

Special Term properly found that in 1961, the year just prior to the taking, the railroad was responsible for the transportation during peak hours of 24% of all commuter traffic between New Jersey and New York. There is nothing in the record to indicate how that commuter traffic would or could be taken care of if this railroad were liquidated. Moreover, there is nothing in the record to indicate that there is any present substitute for the essential service performed by the Hudson tubes, or that any substitute for the tubes is being planned for use in the foreseeable future. Regardless of what might be said about the declining use of the facility, and regardless of the extremely questionable predictions with respect to the declining population of the counties served by this railroad, at the time it was taken it was an essential facility and it is now. There is no proof to the contrary, and the legislative authorization to condemn the tubes is based upon such a premise.

I might also add that the tubes' essentiality is indicated by its continued use by PATH. I would assume that if it were not an essential facility, PATH would not continue to maintain it if, as we are told, it could not be maintained on a profitable basis.

Why then should the condemnee be given only liquidation value for this most essential and active going transit facility?

The majority refers to the testimony of the expert for PATH as follows: "There was testimony by PATH's expert that the highest and best use of the railroad as of September 1, 1962, was to liquidate the property. His opinion was based upon the conclusion that continued operation as a private enterprise would result in continued monetary loss."

I would not want to believe that the majority, or even the condemnor, agrees with the conclusion of that expert that the "highest and best use of the railroad as of September 1, 1962, was to liquidate the property." The continued use by the condemnor of this property as a railroad demonstrates to the contrary.

However, it is urged that liquidation, or scrap value, is the proper standard to apply because the condemnee was operating, not at a profit, but rather at a loss, and that the railroad could not be operated by it at a profit in the foreseeable future. Accordingly, it is reasoned that inasmuch as, eventually, the condemnee must lose its property, it has lost nothing but scrap value by the taking. Special Term rejected this position and I believe rightly so. To begin with, at the time of condemnation the property was not yet lost by the condemnee. At that time it was still operating the railroad as a going concern. It is as of the time of condemnation that we determine the value. At that time it was a useful and valuable property and giving merely liquidation value is not justified by saying that the company might lose it sometime in the future. PATH took an operating and running railroad and not scrap. What it took is what the condemnee lost, and the condemnee should be paid for an operating railroad and not for scrap.

We are told that PATH had no duty to take over this railroad. That is quite immaterial. Whether it took it because of duty or choice, it must pay for what it took. If the taking was simply by choice, it seems that it did so for good and valuable consideration, i.e., the right to condemn 13 square blocks of valuable property in the City of New York.

I do not think that the argument advanced with respect of the failure of the condemnee to operate on a profitable basis is controlling in the circumstances. We must be realistic. We must accept what is generally known to be the fact, that rapid transit facilities in the main cannot be operated profitably for a fare that the Authorities would permit the operator to charge. We must realize that there is now general acceptance of the fact that the furnishing of transit facilities is a matter of governmental concern and can almost be deemed to be a gov-

ernmental function. The very Act that enabled PATH to condemn this property is a recognition of that fact. It is also generally recognized that the operation of these mass rapid transit facilities can only be continued by way of public subsidies. The court could take judicial notice that the Staten Island Ferry cannot be operated profitably on a 5-cent fare, but is subsidized by the City of New York. The Fifth Avenue Coach Company received subsidies; the subway system and the present city bus system cannot operate unless subsidies are given; the State stepped in to make possible the continued operation of the Long Island Railroad and the States involved are deeply concerned with the continued operation of the New Haven Railroad — tax assistance and other subsidies being furnished to assure continued operation of all of the above.

In this case it seems that not only was no subsidy of any consequence granted to the condemnee, but in effect the condemnee has been subsidizing the public in the performance of what is recognized as a governmental function. And now the Government, as represented by PATH, seeks to penalize this company for having done so. That is inequitable.

Nor do I think that the price at which the stock is selling at the market is here controlling, for such price it not necessarily equated with value of physical assets — especially so in this case where there are a multitude of factors that affect stock value. The law calls for the payment of just compensation for the property taken from the condemnee without reference to how the stockholders are affected.

What would be fair compensation in the circumstances of this case? The Port Authority takes the position that in condemnation, the condemnee can only receive market value of the property taken, i.e., what a willing purchaser would pay to a willing seller. Of course, that standard does not apply in this case because there is no market for the tubes; there is no known willing purchaser. I agree with the majority that we cannot apply this standard.

I likewise agree with the majority that reproduction value less depreciation is not the proper standard to be applied. We must come to that conclusion inasmuch as, while the tubes at present are a necessary transportation facility, it is clear that they would not presently be reproduced if new transportation were to be provided. That is not to say that they have outlived their usefulness, as is best proven by the fact that they were taken over for continued use and will be continued in use for the foreseeable future.

Perhaps it would be proper to limit the award to what substitute facilities would now cost. However, there is nothing in the record to determine what this would be, nor is there anything to indicate whether it would be practical to construct substitute facilities. On this point, it should be noted that the Legislature has already determined that the present facility be continued. Indeed, it was to effectuate that determination that PATH was given the power to condemn.

The suggested alternative to these standards is liquidation or scrap value. I think that such standard would not meet the constitutional requirement of just compensation for the reasons given above. Moreover, liquidation value is not the proper standard because PATH took a valuable railroad property that was not to be scrapped and cannot be scrapped for the simple reason that it is an essential facility which must be maintained for the convenience of the public.

What then would be a fair standard to use? It seems to me that the most equitable and just standard of compensation would be to pay the condemnee its cost of the facilities taken. That is the minimum that it lost by the taking. That cost, as appears from the record, is $61,874,440.01. In allowing that sum I do not give the condemnee the benefit of the vastly increased worth of these properties if we were to consider the increased cost trend. Present day reproduction cost minus depreciation would be seven times the original cost. It should be noted, that included in this figure is the original cost of passenger cars. No reduction should be made of this item. Recently, $1,700,000 was expended for new cars which, together with the other cars on hand at the time of condemnation, should easily reach the amount originally expended. It certainly would if we were to apply present day values.

In addition to payment of the physical properties, I believe the condemnee should receive a reasonable amount to represent going concern value because the condemnor did take and the condemnee did lose a going railroad. Physical properties in and of itself do not make a railroad (see *Matter of City of New York [5th Ave. Coach Lines]*, 46 Misc 2d 14, affd. 23 A D 2d 463, mod. 18 N Y 2d 212). Special Term did add 10% of its valuation to cover going concern value but I think the matter should be sent back for additional testimony to either support that figure of 10% or for the substitution of some other amount as may be indicated by the testimony.

I would allow interest at 6% with respect to that portion of the property located in New Jersey. New York limits interest at 4% in a proceeding of this kind, but there is no such limitation in

New Jersey. In the circumstances, and considering the present day money market, I think 6% would be more appropriate and more equitable than 4%.

In arriving at my conclusion I have accepted and depended upon, to a large extent, the excellent and carefully considered opinion of Special Term. I concur wholeheartedly in the findings made. They are thoroughly supported by the evidence presented. I appreciate the court's statement that " [n]o one can hope to find here the factors necessary for reaching some degree of mathematical exactitude in the ascertainment of just compensation." Nevertheless, I do believe that the higher amount representing the original cost furnishes a more sound basis for arriving at an equitable and just result.

Accordingly, I would modify the final decree to award to the petitioner the sum of $61,874,440.01, together with interest at the rate of 4% for that portion of the property located in New York, and 6% for the portion located in New Jersey. In addition, I would remand the case for further testimony to determine and award to the petitioner an amount representing going concern value.

CAPOZZOLI, J. (dissenting in part). I agree with the reasoning contained in the dissenting opinion of Mr. Justice RABIN herein, but I do not, however, believe that a remand of the case for further testimony with reference to going concern value is necessary in view of the voluminous record already made by the parties.

The important and basic finding by Special Term that the " Hudson Tubes is a vital, essential and indispensable trans-Hudson commuter railway facility " is amply supported by the record. No one contradicts this finding. In fact, PATH agrees that if this railroad were to cease operations, the remaining trans-Hudson vehicular facilities would not be able to handle the passenger load. The expert, Burpee, testifying for PATH, expressed the opinion that Hudson & Manhattan should be liquidated and, yet, he did say that the railroad " has utility as an absolutely essential public service ".

How can we then speak of scrap value or liquidating value? This is not something which is of no further use. We can only speak of scrapping and liquidating when the enterprise has ceased to be of any service or need to anyone. But this is not so in the case at bar. One can readily visualize the reaction of the passengers and the public authorities if it were announced that the railroad was being discontinued. The simple fact is that no one has come forward with any suggestion of any sub-

stitute facility which could take its place and the record is completely silent on this subject.

I am mindful, of course, of the rule that " the question is what has the owner lost, not what has the taker gained ". (*Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195, cited in majority opinion.) But we are dealing with a most unusual situation. As Special Term said: " in the exceptional circumstances in this condemnation case, as conventional formulas are inappropriate they must yield ". In *Boom Co.* v. *Patterson* (98 U. S. 403, 408) the court said: " So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule ". Years later this same court, in *United States* v. *Chandler-Dunbar Co.* (229 U. S. 53, 77) approved the above quotation and also stated as follows: " Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose." It can be readily agreed that if this existing facility were to be discontinued the public authorities, both of New Jersey and New York, would be hard put to provide substitute facilities. The truth is that they would have to continue the existing railroad even though they would have to dip into the public treasury to pay therefor. For, as was said by the court in *Matter of City of New York (5th Ave. Coach Lines)* (18 N Y 2d 212, 218): " However laudable the political motivation is in depriving claimants of their transportation system, they must be fully compensated therefor ". And giving to this claimant scrap or liquidation value is not full compensation.

The majority also takes the position that, because the railroad is incapable of profitable operation, the allowance by Special Term for going concern value was unwarranted. I do not agree. The Court of Appeals, in *5th Ave. Coach Lines (supra,* p. 223) said: " The argument made by the respondent that going concern value should not be allowed where the court found an inadequate plant, dwindling profits and poor future prospects was made long ago and rejected. [Citing authority.] " I believe the amount awarded by Special Term, after its very thorough and painstaking consideration of this complex problem, is fair and equitable and fulfills the constitutional requirement of just compensation for what was taken.

I therefore vote to affirm.

BREITEL, J. P., concurs in the result in an opinion; STEUER, J., concurs in an opinion; RABIN and CAPOZZOLI, JJ., each dissent in part in separate opinions.

Final decree, entered on June 13, 1966, modified, on the law and on the facts, so as to reduce the award to claimant-appellant-respondent Hudson Rapid Tubes Corporation for the railroad properties to the sum of $3,500,000 and to reduce the rate of interest on the applicable New Jersey portion of the properties to 4%, and, as so modified, the final decree is otherwise affirmed, without costs or disbursements to either of the parties.